UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 21-11226 (CJP) |
| NESV ICE, LLC, *et al*,[1] | ) |  |
|  | ) | Jointly Administered |
| Debtor. | ) |  |
|  | ) |  |
|  | ) |  |
| NESV ICE, LLC, NESV FIELD, LLC, | ) |  |
| NESV SWIM, LLC, NESV HOTEL, LLC, | ) |  |
| NESV LAND, LLC, NESV TENNIS, LLC and | ) | Adv. Proc. No. 21-1093 |
| NESV LAND EAST, LLC, | ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| SHS ACK, LLC, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

**SHS ACK, LLC'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO DISMISS THE COMPLAINT**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable herein

by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, the defendant SHS ACK LLC

("SHS" or "Defendant") hereby submits this memorandum of law in support of its *Motion to*

*Dismiss* the Debtors' complaint in its entirety being contemporaneously filed herewith.  The

Complaint should be dismissed because: (1) the Debtors' requests for declaratory relief are not

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax
identification number, are as follows: NESV Ice, LLC ("Ice") (1262), NESV Swim, LLC
("Swim") (5919), NESV Tennis, LLC ("Tennis") (6937), NESV Land East, LLC ("Land East")
(4138), NESV Field, LLC ("Field") (5539), NESV Hotel, LLC ("Hotel") (9151), and NESV
Land, LLC ("Land") (2353) (collectively referred to as the "Debtors" or "Plaintiffs").

ripe or plausibly alleged; (2) the Debtors' request for equitable subordination is not yet ripe for

determination and not plausibly alleged; and (3) the Debtors' requests to avoid the Land East

transaction fail as a matter of law based on their failure to plausibly allege proper standing,

injured creditors, lack of reasonably equivalent value, and insolvency.

The Debtors, who are owned and managed by sophisticated investors, received the

benefit of millions of dollars in loans and several years of patience and cooperation from SHS'

predecessor, HarborOne Bank ("HarborOne"), notwithstanding numerous and ongoing Events of

Default under the Loans – many well in advance of COVID-19.  They now cry foul that they

were held to their word and the terms of the Loan Documents were enforced.  Fundamentally, as

set forth below, the Debtors' claims are not ripe, precluded by the plain terms of the Loans,

Promissory Notes, Guaranties, and Amendments underlying their dispute with SHS, and contrary

to or otherwise implausibly pled under law and equity.  Accordingly, this matter should be

dismissed in its entirety, and with prejudice.

## PRELIMINARY STATEMENT

Defendant SHS is the holder of several facilities made by HarborOne and executed in

June of 2016 by the Plaintiffs – a group of six separate but related corporate entities who hold six

different pieces of property and are now six different bankruptcy estates, their non-debtor owner

Ajax 5Cap ("Ajax"), and the individual manager of each debtor, Stuart Silberberg ("Silberberg").

Included amongst these loans was a construction loan, with an original principal amount of

$9,506,000.00 (the "Construction Loan") and a term loan for $1,960,000.00 (the "Term Loan")

(collectively, the "Loans").  The Loans have been in default for years.

Debtor plaintiffs Ice, Swim, Tennis, Land East, Field, Hotel, and Land collectively

brought this adversary proceeding against SHS seeking: (i) declaratory judgment that the Default

Rate of interest of 18% per annum provided for by the Loans and promissory notes held by SHS

is unenforceable and/or may not be collected from March 1, 2017 to present; (ii) equitable

subordination of the millions of dollars in debt the Debtors owe to SHS; and (iii) to avoid and

recover certain transfers to SHS' predecessor in interest, HarborOne, pursuant to M.G.L. c. 109A

§§ 5, 6 and 11 U.S.C. § 548.  *See generally* Complaint ("Compl.") ¶¶ 76-148, annexed to

November 22, 2021 Declaration of Christopher Marks ("Marks Decl.") at Exhibit ("Ex.") A.[2]

On every count the Complaint fails to plausibly state a claim upon which relief can be

granted as against SHS and should therefore be dismissed.  Indeed, much, if not all, of the

allegations of inequitable conduct set forth in the Complaint are targeted at the insiders of the

Debtors, namely their attorney Michael Sullivan, Silberberg and Ajax.  Specifically, the

underpinning of the entire Complaint relates to the Debtors' failed development of a "Sports

Village" in Attleboro, Massachusetts and the Debtors' apparent belief that they are entitled to an

unlimited amount of time to make that project a success while failing and refusing to fulfill even

the most basic of their contractual obligations to their secured lender.  In fact, the Debtors'

substantive allegations against SHS are simply that it stepped in the shoes of HarborOne and

began to enforce its rights against its collateral by advertising a foreclosure sale, as required

under Massachusetts law. Clearly on these allegations alone the Debtors have failed to state a

claim against SHS.

Further, the allegations contained in the Complaint concerning the existence of certain

events of default and the accrual of default interest cannot sustain a plausible claim for relief

because the Debtors have specifically acknowledged the existence of those defaults and agreed

that all rights to enforce those defaults were not waived by HarborOne's decision not to

---

[2]      All subsequent citations to documentary evidence are to exhibits annexed to the Marks
Decl. which is being filed contemporaneously herewith.

immediately enforce its rights under the Loan Documents.  The Debtors themselves further waived any and all contest or defense that they might have had as to HarborOne, or its assignee SHS', eventual exercise of its rights in relation thereto. Thus, the allegations in the Complaint concerning the existence and enforceability of the defaults under the Loan Documents fail to state a claim upon which relief can be granted militating the dismissal of Count I.

The Debtors' attempts to avoid the mortgage on Land East's real property is similarly not plausibly alleged because said mortgage was made to secure its guarantee of the other Debtors' obligations to HarborOne (and by assignment SHS), which guarantee was specifically made to induce HarborOne to modify the terms of said underlying indebtedness for the benefit of all of the Debtors, including Land East.  In essence because the Debtors were unable to make their development project a success, notwithstanding the considerable accommodations that HarborOne made through its Loan Modification, they seek to nullify the additional security they gave to HarborOne as consideration for said modification and patience.  In other words, the Debtors are unhappy with the results of their business decisions and seek to undo those decisions *only after* they already received more than fair consideration from SHS' predecessor in interest. Clearly, the Complaint's allegations in this regard fail to plausibly state a claim to avoid the Land East Mortgage.

Therefore, because the Complaint fails to state a plausible claim on any of its counts it should be dismissed.

## STATEMENT OF FACTS[3]

In June of 2016, HarborOne Bank ("HarborOne") made several loans to certain related corporate entities, i.e., NESV Ice, LLC, NESV Swim, LLC, NESV Field, LLC, NESV Hotel, LLC, NESV Tennis, LLC, and NESV Land, LLC (collectively referred to under the Loans as, "Borrowers"). Compl., ¶¶ 5-6. The purpose of these loans was to finance the construction and development of an ice-skating rink as part of a planned commercial development of the "New England Sports Village," which was contemplated to also include tennis courts, soccer fields, a swimming complex, and a hotel, on approximately 139 acres of real property owned by the Borrowers and located in Attleboro, Massachusetts (the "Property"). Compl. ¶ 5-6. Included amongst these loans was a construction loan, with an original principal amount of $9,506,000.00 (the "Construction Loan") and a term loan for $1,960,000.00 (the "Term Loan") (collectively, the "Loans"). *Id.*, ¶¶ 13-14. The Debtors, through their owner Ajax, and their manager, Silberg, are sophisticated investors who were represented by counsel when they entered into the Loan Documents at arm's length. *See*, *e.g.*, Construction Loan at Ex. B, notice provisions, § 11.11 (indicating counsel for the parties to the loan).

In order to evidence and secure the Loans, the Borrowers executed, *inter alia*, underlying promissory notes to HarborOne (the "Notes"), and granted HarborOne first position mortgages on the Property (or subdivisions thereof) securing repayment of the Notes (the "Mortgages").

---

[3]      In support of its Statement of Facts, SHS cites to various documents attached as exhibits to the Declaration of Christopher Marks. As discussed, *infra*, in the Standard of Review for the instant motion, these documents are, *inter alia*, incorporated by reference in the Complaint. *See Yan v. Rewalk Robotics Ltd.*, 973 F.3d 22, 31 (1st Cir. 2020) ("We may also consider documents attached to the complaint and incorporated by reference therein.") Additionally, SHS in no way concedes the allegations set forth in Plaintiffs' Complaint. However, mindful of the Court's obligation to accept Plaintiffs' well pleaded allegations as true, Defendant will do so for the purposes of this motion only, and where uncontradicted by documents which this Court may appropriately consider for these purposes.

*See Compl.* ¶ 13-14.  As additional security for the Loans, Borrowers also caused to be executed

several guarantees relevant herein: the Construction Loan Payment Guaranty ("CL Payment

Guaranty"), the Construction Loan Completion Guaranty ("CL Completion Guaranty"), and the

Term Loan Payment Guaranty ("TL Payment Guaranty") (collectively, the "Guarantees").  *See*

*id.* ¶¶ 13-15 (alleging that the Debtors along with Silberg and Ajax "contemporaneously

guaranteed certain obligations"); *see also* CL Payment Guaranty, CL Completion Guaranty, and

TL Payment Guaranty at Exs. F, G, and H, respectively.  The executors and guarantors of the

Guarantees collectively consisted of the Borrowers, as well as on each and all of the Guarantees:

Ajax 5Cap NESV, LLC ("Ajax") – the sole member of Borrowing Debtors – and Silberg, the

manager and signatory of all of the Borrowers and Ajax.  *See* CL Payment Guaranty at Ex, F, p.

1; CL Completion Guaranty at Ex. G, p. 1; TL Payment Guaranty at Ex. H, p. 1.  The Guarantees

each provide for joint and several liability among the guarantors thereunder.  *See* CL Payment

Guaranty at Ex. F, § 23; CL Completion Guaranty at Ex. G, § 24; TL Payment Guaranty at Ex.

H, § 23.  If an Event of Default (monetary or otherwise) occurred under the Loans, per the terms

of the Notes, the holder was entitled to enforce a default rate of interest, which, at all relevant

times, was 18%.  *See* Compl., ¶ 17.

Numerous Events of Default occurred within the first year after execution, with Ajax,

Silberg, and Borrowers seemingly unable to perform the most basic aspects of the agreements

to which they had agreed.  For example, under the terms of the Loans, Swim, Field, Hotel,

Tennis, Land, and Ajax were required to provide, *inter alia*, quarterly financial statements

"within thirty (30) days following the close of each fiscal quarter beginning with the quarter

ending December 31, 2016[.]"  *See, e.g.*, Construction Loan Agreement at Ex. B, §§ 7.2, 8.2.

Failure to provide these statements, under the clear terms of the Loans, was an Event of Default

for which interest at the Default Rate could be assessed.  *See id.*, § 9.1(d).  By April 10, 2019,

Borrowers, Silberberg, and Ajax had yet to provide a *single* quarterly financial statement.  *See*

Letter dated Apr. 10, 2019 ("Apr. 10 Letter") at Ex. I, Ex. A thereto (listing delinquent

borrower/guarantor financial statements).  Many other Events of Default under the Loans had

occurred by April 2019.  *See id.*, *generally*; *compare also*, *e.g.*, Compl. ¶ 23 (CSM put a lien on

the Property), ¶¶ 26, 68 (Ice failed to pay deposit due under § 7.19 of the Construction Loan),

*with*, *e.g.*, Construction Loan Agreement at Ex. B, §§ 7.19, 9.1(b), 9.1(l) (failure to pay deposit

and permitting liens on the Property for more than 45 days both being Events of Default).  One

particularly relevant Event of Default occurred in March 2017 when the Debtors failed to

provide certain ground leases, or otherwise deposits in escrow (which were to total

$1,000,000.00).  *See* Apr. 10 Letter at Ex. I, p. 2; Compl. ¶ 26; Construction Loan at Ex. B, ¶¶

7.19, 9.1(b).

Accordingly, in April 2019, HarborOne sent two letters, *inter alia*, notifying the Debtors

of the various Events of Default and reserving its rights as to same.  *See* Compl., ¶¶ 25-26; Apr.

10 Letter, *generally*; and December 22, 2020 Letter pertaining to Term Loan ("Dec. 22 TL

Letter") at Ex. O, p. 2 and at Ex. "A" thereto.  HarborOne sent another such letter on August 2,

2019.  *See* Compl., ¶ 28; August 2, 2019 Letter ("Aug. 2 Letter") Ex. J.  HarborOne attempted

for years to work through these issues with Debtors, to no avail.

After several years with the Debtors in default, HarborOne, the Debtors, Silberberg, and

Ajax executed the First Omnibus Amendments to the Loans, under which, *inter alia*, Land East

became a borrower and guarantor and Ajax was permitted to incur up to $20,000,000.00 of

additional debt from non-party Ashcroft Sullivan Sports Village Lender, LLC, with up to $7.5

million being secured pursuant to a second mortgage on the Property.  *See* First Omnibus

Amendments to Construction and Term Loans at Exs. K, L, *generally*; Compl. ¶ 32.  Moreover, through the First Omnibus Amendments, Ice was permitted to lease its rooftop to a solar power producing company GSPP NESV, LLC, which lease would immediately generate $250,000.00 in revenue for Ajax and/or the Debtors in addition to the monthly rents due thereunder.  *See e.g.,* First Omnibus Amendment to Construction Loan at Ex. K ¶8.12.  The Debtors, Silberberg, and Ajax – all represented by new counsel – also ratified and reaffirmed their obligations under the Loan documents.  *See* First Omnibus Amendment to the Construction Loan at Ex. K, §§ 2, 11-12, 16;  First Omnibus Amendment to the Term Loan at Ex. L, §§ 2, 12-13, 17.

Thereafter, on December 22, 2020, HarborOne both accelerated the Loans, demanded the interest due at the Default Rate thereunder, and assigned the Loan Documents to SHS.  *See* Compl. ¶¶ 45-47, 61.  The Debtors, unwilling to pay the amounts owed under the Loans, filed under Chapter 11, then subsequently brought this adversary proceeding seeking declaratory and equitable relief against SHS.  *See generally*, Compl.

## ARGUMENT

## I.   LEGAL STANDARD APPLICABLE TO A MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.] Factual allegations must be enough to raise a right to relief above the speculative level[.]") (internal quotation marks and citations omitted).

"Under Rule 12(b) (6), the district court may properly consider only facts and documents that are part of or incorporated into the complaint." *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (internal quotation omitted).  "From this rule, the First Circuit makes 'narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff['s] claim; or for documents sufficiently referred to in the complaint.'" *Lowenstern v. Residential Credit Sols.*, No. 11-11760-MLW, 2013 U.S. Dist. LEXIS 25535 at *8 (D. Mass. Feb. 24, 2013) (quoting *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993)); *Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (holding that, in ruling on a motion to dismiss, a court "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint . . . .")  "When such documents contradict an allegation in the complaint, the document trumps the allegation." *Lowenstern*, 2013 U.S. Dist. LEXIS 25535, at *8 (citing *Clorox Co. P.R.*, 228 F.3d at 32).

Here, SHS has attached a number of documents which are central to the Debtors' claims, incorporated by reference in the Complaint, or both.  *See generally*, Exs. B-Q.  Specifically, SHS has attached, as integral to the Complaint: the Construction and Term Loan Agreements including the First Omnibus Amendments and alonges thereto, the Notes underlying same, the Construction Loan Payment Guaranty, Construction Loan Completion Guaranty, Term Loan Payment Guaranty, Land East Payment Guaranty, and the December 22, 2020 Default Notices issued by HarborOne including their exhibits.  These documents are referred to repeatedly throughout the Complaint and are central to the Debtors' claims.  *See*, *e.g.*, Compl. ¶¶ 60-67 (quoting the terms of the Notes repeatedly and relying thereon); *id.*, ¶¶ 54-59, 79-80 (relying on the timing of the assignment of the Loans and the December 22, 2020 Default Notices to assert

claims for declaratory relief); *id.*, ¶¶ 107-148 (seeking to effectively undo the terms of the First

Omnibus Amendments).   Additionally, SHS has attached the notice of default and reservation of

rights letter dated April 10, 2019 (which the Debtors refer to repeatedly as the "April 10 Notice")

and the similar letter issued on August 2, 2019, as incorporated by reference in the Complaint.

*See* Compl. ¶¶ 25-26, 28.   SHS respectfully contends that these documents – which contradict

keystone allegations in the Complaint – are properly considered by the Court herein.   *See Hughes*

*v. McMenamon*, 204 F. Supp. 2d 178, 181 (D. Mass. 2002) ("The contract is integral to the

claims made in the Complaint, and its content is relied upon therein.   Accordingly, the Court

may consider the entirety of the contract as part of the pleadings.") (internal evidentiary citation

omitted) (citing *Blackstone Realty LLC v. FDIC,* 244 F.3d 193, 195 n.2 (1st Cir. 2001); *Beddall*

*v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998)).

## II.   THE DEBTORS' REQUESTS FOR DECLARATORY RELIEF ARE NOT RIPE AND NOT PLAUSIBLY ALLEGED

The Complaint seeks declaratory judgment that: (1) the default interest provision under

the Loans is unenforceable under general principles of Massachusetts law and/or G.L. c. 271 §

49 (the criminal usury statute); and/or (2) SHS may not charge interest at the default rate from

March 1, 2017 to present.   *See* Complaint at Count I, ¶¶ 76-81.   In other words, the Complaint

seeks to determine the amounts of SHS' claims against the Debtors.   As set forth below, these

claims fail both procedurally and substantively and should therefore be dismissed.

Procedurally, these claims are both improper in an adversary proceeding and not ripe

for determination.   Rule 7001 of the Federal Rules of Bankruptcy Procedure sets forth the proper

scope of adversary proceedings, excluded from which are "proceeding[s] under Rule 3012 . . . ."

*See* Fed. R. Bankr. P. 7001(2).   Rule 3012 pertains to, *inter alia*, determining the amounts "of []

secured claim[s] under § 506(a) of the [Bankruptcy] Code" and priority claims.   *See id.* at 3012,

*generally*.  Under 11 U.S.C. § 506(a)(1), "[a]n allowed claim of a creditor secured by a lien on

property in which the estate has an interest, or that is subject to setoff under section 553 of this

title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest

in such property, or to the extent of the amount subject to setoff, as the case may be . . . ."

     Here, taken as true, the Complaint alleges that the Loans under which payment is owed to

SHS are secured by mortgages and first priority mortgages "on the Debtors' real estate and liens

on the Debtors' personal property."  Compl. ¶¶ 13-14, 85.  In other words, SHS is a secured

creditor and the value of its secured claims will be properly determined under Fed. R. Bankr. P.

3012.  Moreover, the Debtors' arguments are not ripe as SHS has not yet filed its proof of

claim(s) as required by Rule 3002, which is due on or before November 29, 2021.  *See generally*,

Civil Docket (listing deadline to file claims as November 29, 2021); *see also id.*, at claims

register for this matter.  Accordingly, the Debtors' request for declaratory relief which would

determine the amount of SHS' secured claims is both improper in an adversary proceeding under

Rule 7001(2), and not yet ripe insofar as SHS has not yet filed its proof of claim(s) herein.[4]

     As discussed below, the Debtors' claims also fail substantively as a matter of law.

## III.   THE COURT SHOULD DISMISS ALL COUNTS IN THE DEBTORS' COMPLAINT BECAUSE THE DEBTORS HAVE WAIVED ALL OF THEIR RIGHTS TO THE RELIEF THEY SEEK

     As an initial matter, in connection with the Loans and First Omnibus Amendments

thereto, the Debtors executed multiple waivers as and for consideration and inducement to the

lender, HarborOne for the Loans.  *See* Construction Loan Agreement at Ex. B, §§ 5.3, 9.3-9.4;

Term Loan Agreement at Ex. C, §§ 5.3, 9.3-9.4; CL Payment Guaranty at Ex. F, §§ 10-11, 13,

---

[4]    SHS acknowledges it has sought satisfaction of its claims as against, Debtor's sole member Ajax and its manager Silberberg in separate actions.  Under the terms of the Loans, Ajax and Silberberg are jointly and severally liable for the full amounts due under the Loans.  *See, e.g.,* CL Payment Guaranty at Ex. F, § 23.

16, 20; TL Payment Guaranty at Ex. H. §§ 10-11, 13, 16, 20; Land East Guaranty at Ex. M, §§

10-11, 13, 16, 20.  More specifically, the Debtors have waived any defenses based on subsequent

assignment of the Loans, Notes, and Guaranties, and any argument that SHS' rights thereunder

are diminished or reduced in any way (discussed further below in Point I(D)).  CL Payment

Guaranty at Ex. F, § 11(a)**;** TL Payment Guaranty at Ex. H, § 11(a); Land East Guaranty at Ex.

M, § 11(a).  They have also waived any argument that delay, forbearance, reservation of rights,

etc., by the holder diminishes its ability to enforce the Loans, Notes, and Guaranties.  *See*

Construction Loan Agreement at Ex. B, § 9.4; Term Loan Agreement at Ex. C, § 9.4; *Id.*, §§CL

payment Guaranty, at Ex. F, § 11(e), (g); TL Payment Guaranty, at Ex. H, § 11(e), (g); Land East

Guaranty, at Ex. M, § 11(e), (g).   The Debtors have further "waive[d] all defenses, legal or

equitable or otherwise available to [them] and waive[d] presentment, demand for payment,

notice of dishonor, protest, notice of nonperformance and notice of protest and nonpayment

relative to the Loan[s]."  CL Payment Guaranty at Ex. F, § 16; TL Payment Guaranty at Ex. H, §

16; Land East Guaranty at Ex. M, § 16.  The Guaranties contain an additional paragraph entitled

"No Contest With Lender" in which the Debtors agreed that:

> [n]o set-off, counterclaim, reduction or diminution of any
> obligation, or any claim or defense of any kind or nature which
> Guarantor may have against Borrower or Lender shall be available
> as a defense hereunder to Guarantor's payment and performance of
> the Guaranteed Obligations.  Guarantor shall not, in any proceeding
> involving a bankruptcy, insolvency, or reorganization of Borrower,
> prove in competition with Lender regarding the Loan or the
> Guaranteed Obligations.

CL Payment Guaranty at Ex. F, § 20; TL Payment Guaranty at Ex. H, § 20; Land East Guaranty

at Ex. M, § 20.  The First Omnibus Amendments to the Loans also contain a clause in which the

Debtors agreed that certain defaults had occurred under the Loans and that there were no

defenses thereto.  *See* First Omnibus Amendment to Construction Loan at Ex. K, § 19; First

Omnibus Amendment to Term Loan at Ex. L, § 20.  In fact, the Debtors were specifically informed in April 2019 of the existence of numerous defaults under the Loans and that as a result thereof, HarborOne was entitled to collect default interest on the entire principal balances of the Loans from March 1, 2017, forward.  *See* Exs. I and J.

Accordingly, the Debtors have already waived their claims herein that¸ *inter alia*, the Default Rate is unenforceable, they would be entitled to any diminution or subordination of their obligations to SHS, or that the fact of the assignment in any way reduces or impairs SHS' ability to enforce the Debtors' obligations.

## IV. THE DEBTORS' CLAIM AND REQUEST FOR A DECLARATION THAT THE 18% DEFAULT RATE IS AN UNENFORCEABLE PENALTY FAILS BECAUSE, *INTER ALIA*, THEY HAVE NOT ALLEGED THAT ACTUAL DAMAGES WERE EASILY ASCERTAINED, NOR ALLEGED A REASONABLE ESTIMATE OF DAMAGES

The Debtors argue that under Massachusetts law the 18% Default Rate of interest constitutes an unenforceable penalty, rather than a reasonable forecast of damages.  Compl. ¶¶ 63, 78.  Under Massachusetts law, default interest clauses operate as liquidated damages provisions, "enforceable . . . under the theory that they compensate the lender for damages it would incur if the borrower defaulted."  *In re Charles St. African Methodist Episcopal Church of Bos.*, 481 B.R. 1, 10 (Bankr. D. Mass. 2012) ("*In re Charles St.*") (citing *In re 201 Forest Street, LLC*, 409 B.R. 543, 565 (Bankr. D. Mass. 2009); *Cummings Props., LLC v. Nat'l Comm. Corp.*, 449 Mass. 490, 494, 869 N.E.2d 617 (2007)), *aff'd* 501 B.R. 1 (D. Mass. 2013).  As the Supreme Judicial Court of Massachusetts articulated in *NPS, LLC v. Minihane*:

> A liquidated damages provision will usually be enforced provided two criteria are satisfied: first, that at the time of contracting the actual damages flowing from a breach were difficult to ascertain; and second, that the sum agreed on as liquidated damages represents a 'reasonable forecast of damages expected to occur in the event of a breach.'

*NPS, LLC v. Minihane*, 451 Mass. 417, 420, 886 N.E.2d 670, 673 (2008) (quoting *Cummings*

*Props., LLC v. National Communications Corp.*, 449 Mass. at 494); *accord. Prudential Ins. Co.*

*of Am. V. SW Boston Hotel Venture, LLC (In Re SW Boston Hotel venture, LLC)*, 748 F.3d 393,

414 (1st Cir. 2014).  In other words, a complaint must adequately plead:

> . . . either of two things: that at the time of contracting, the actual
> damages flowing from a future breach did not appear that they
> would be difficult to ascertain; or that the sum agreed on as
> liquidated damages did not, at the time of contracting, represent a
> reasonable forecast of damages expected to occur in the event of a
> breach. If either is established, the default interest provision is not
> enforceable.

*In re Charles St.*, 481 at 11; *Reed v. Zipcar, Inc.*, 527 F. App'x 20, 24 (1st Cir. 2013) (Souter,

Associate Justice (Ret.)) (affirming, *de novo*, dismissal of claims that late fees were an

unenforceable penalty rather than liquidated damages based on the failure to adequately plead

either prong).  "Liquidated damages will not be enforced if the sum is 'grossly disproportionate

to a reasonable estimate of actual damages' made at the time of contract formation."  *Kelly v.*

*Marx*, 428 Mass. 877, 880, 705 N.E.2d 1114, 1116 (1999) (quoting *A-Z Servicenter, Inc. v.*

*Segall*, 334 Mass. 672, 138 N.E.2d 266, 268 (Mass. 1956)).  Lastly, "[a] contractual liquidated

damages provision is entitled to a presumption of validity, especially where, as here, it was

negotiated between two sophisticated parties."  *Nantasket Beachfront Condos., LLC v. Hull*

*Redevelopment Auth.*, 87 Mass. App. Ct. 455, 469, 32 N.E.3d 318, 329 (2015).

Here, the Debtors allege only that the "dramatic disparity between the rates of Default

Rate (not less than 18%) and the non-default interest under the Notes (3.64% as of December 22,

2020) demonstrates that the Default Rate was not a reasonable forecast of damages, and is

instead an unenforceable penalty."  Compl. ¶ 63 (citing *In re Charles St.*, 481 B.R. at 12-13).

However, the Debtors fail to allege (plausibly or otherwise) that the actual damages flowing

from a breach of the Loans were easily ascertained, nor do they provide any allegations

articulating a reasonable estimate of damages from which this Court could conclude the damages

sought were grossly disproportionate. *See generally*, Complaint. "This is sufficient to defeat

this claim because . . . [Debtors] cannot adequately plead 'that the [liquidated damages] [are]

'grossly disproportionate' to the expected harm . . . without coming up with a reasonable

approximation of that harm." *Zipcar*, 527 F. App'x at 24; *id.*, ("[s]imply put, Reed's complaint

contains no allegations as to what a reasonable estimate of damages would be."); *see also In re

SW Boston Hotel Venture, LLC*, 748 F.3d at 414 (default interest rate of 14.5% upheld where

debtor did not carry their burden to show that the default rate "was not reasonably related to

anticipated damages and, in fact, was so grossly disproportionate to anticipated damages or

otherwise unconscionable as to unenforceable under Massachusetts law."); *Bose Corp. v.* Ejaz,

732 F.3d 17 (1st Cir. 2013) ("Since Ejaz has not introduced any evidence to rebut Bose and show

that $50,000 for each of seven violations was an unreasonable forecast, he remains bound by the

liquidated damages clause.") (citing *Zipcar,* supra at 24); *Bridge over Troubled Waters, Inc. v.

Argo Tea, Inc.*, 220 F. Supp. 3d 213, 220 (D. Mass. 2016) ("Nor does Argo provide at any point

an estimate as to what reasonable damages would be in this case. The First Circuit has held that

such failure is sufficient to defeat a claim that a liquidated damages contract provision represents

an unreasonable forecast of damages and is grossly disproportionate to the expected damages.")

(citing *Zipcar*, supra at 24). Debtors have therefore failed to adequately plead their claim that the

default interest rate represents an unenforceable penalty, rather than liquidated damages

providing a reasonable forecast of damages. This claim should be dismissed accordingly.

**V.     THE DEBTORS' REQUEST FOR A DETERMINATION THAT THE 18%
DEFAULT RATE IS UNENFORCEABLE UNDER § 49 FAILS BECAUSE
COMPOUND INTEREST HAS NOT BEEN SOUGHT FROM THEM**

Section 49 of Chapter 271 of the Massachusetts General Laws "is a criminal usury statute
which prohibits the charging of interest greater than 20% per annum unless one first informs the
attorney general that one intends to charge such a rate." *In re Rolfe*, 25 B.R. 89, 94 (Bankr.
Mass. 1982) (citing Mass. Gen. Laws ch. 271 § 49). Some courts have held that where interest
may compound on top of interest, "the nature of compounded interest sooner or later take the
effective rate of interest above the 20% rate." *Id.*

The Debtors allege "Section 5(a) in each of the Notes violates the usury statute and is
unenforceable because, among other things, it provides for the accrual of interest on interest (*i.e.*,
compound interest)." (citing *In re Rolfe*, 25 B.R. at 94). Based on that allegation, the Debtors
seek "a declaration that the default interest provisions of the Notes at Section 5(a) are
unenforceable because they provide for compound interest and violate G.L. c. 271 § 49." *See*
Compl. ¶ 81. As the Debtors acknowledge, Section 5(a) of the Notes provides:

> *To the maximum extent permitted by applicable law*, Principal,
> interest and other fees, charges, costs and expenses not paid when
> due shall accrue interest, payable on demand, from and after the date
> which is five (5) consecutive calendar days following the date when
> due until the date when actually paid at the Default Rate.

*See* Compl. ¶ 65 (emphasis added); *see also* Notes at Exs. D & E, § 5(a)**.**

The Debtors do not, and cannot, allege that SHS has sought compound interest, nor that
they have a reasonable or good faith basis to believe that SHS will seek to charge compound
interest in the future. *See generally*, Complaint. As discussed above, no claim has yet been filed
against the Debtors herein, let alone one seeking compound interest or simple interest in excess
of 20%. Only simple interest on the principal at the Default Rate has ever been referred to or
described under the notices alleged in the Complaint, i.e., the April 10, 2019 letter, August 2,

16

2019 letter, and December 22, 2020 default notices.  *See* Exs. I, J, N, O, *generally*.  Thus, the

declaratory relief sought fails because, *inter alia*, it does not present a live, justiciable

controversy – the Debtors are not obligated to pay compound interest under the Loans or Notes

to the extent that it violates applicable law, and none is or has been sought from them.  *See*

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ("Our decisions have required

that the dispute be definite and concrete, touching the legal relations of parties having adverse

legal interests; and that it be real and substantial and admit of specific relief through a decree of

conclusive character, as distinguished from an opinion advising what the law would be upon a

hypothetical state of facts.") (citations and quotations marks omitted).

Moreover, the Debtors' allegation and request for declaratory relief ignores the

emphasized language, which contemplates that applicable law might limit the interest charged

and serves as a "savings clause" which "preemptively resolves conflicts between contract

language and applicable law in order to preserve the remaining, non-conflicting contract

language." *Kristian v. Comcast Corp.*, 446 F.3d 25, 48 n.16 (1st Cir. 2006) (approving a similar

savings clause setting forth rights and remedies "unless applicable law provides [otherwise]").

The Debtors similarly choose to ignore the subsequent and more expansive savings

clause found under the Notes at § 13, entitled "LEGAL LIMITATIONS ON INTEREST" and

providing:

> [i]f from any circumstances whatsoever fulfillment of any provisions of this Note,
> at the time performance of such provision shall be due, shall involve transcending
> the limit of validity presently prescribed by any applicable usury statute or any other
> law, with regard to obligations of like character and amount, then ispo facto the
> obligation to be fulfilled shall be reduced to the limit of such validity, so that in no
> even shall any exaction be possible under this Note that is in excess of the limit of
> such validity.  In no event shall Borrower be bound to pay for the use, forbearance
> or detention of the money loaned pursuant hereto, interest of more than the current
> legal limit; the right to demand any such excess being hereby expressly waived by
> Lender.

Notes, at Exs. D & E, § 13.  Thus, the plain language of the contracts negates the Debtors' claims

and serves to preemptively sever any language regarding interest provided for under the Notes

which would conflict with applicable law – and specifically any applicable usury statute.

*Kristian*, 446 F.3d at n.16 ("In essence, a savings clause serves as an expression of the intent of

the parties that limits the remedies an arbitrator or court may use in situations of conflict between

contract terms and applicable law.")

    Debtors' request for declaratory relief in regard to the usury statute should be dismissed.

## VI.   THE DEBTORS' REQUEST FOR A DECLARATION THAT SHS CANNOT CHARGE DEFAULT INTEREST FROM MARCH 2017 IS CONTRADICTED BY DOCUMENTS INTEGRAL TO THE COMPLAINT

    The Complaint also seeks a declaration that "SHS is not entitled to collect the Default

Rate of Interest of 18% per annum retroactive to March 1, 2017" or "that SHS is not entitled to

charge the Default Rate of interest of 18% per annum for any period prior to January 2021, or

such other date as the Court may determine."  Compl. ¶¶ 79-80.  The Complaint makes two sets

of allegations in support of this relief, both of which are, *inter alia*, fatally contradicted by

documents which this Court may properly consider on a motion to dismiss.  *See* Compl. ¶¶ 54-

59, 67-72.

    In sum and substance, the first set of allegations seems to claim that because HarborOne

executed certain documents (which Debtors refer to collectively as "Notices of Assignment") on

December 12, 2020, that the December 22, 2020 Default Notices sent by HarborOne could not

accelerate payment or charge default interest.  *See id.*, ¶¶ 54-59.  The allegations regarding

HarborOne's execution of these documents are misleading however because elsewhere the

Complaint acknowledges December 22, 2020 as "the alleged date of the assignment to SHS . . ."

*Id.*, ¶ 61.  The Complaint makes no direct allegations regarding when the Notes and Loans were

actually transferred, i.e., when the equitable interest in them would have likewise transferred.

*See, e.g., Kiah v. Aurora Loan Servs., LLC*, Civil Action No. 10-40161-FDS, 2010 U.S. Dist.

LEXIS 121252, at *11-12 (D. Mass. Nov. 16, 2010) ("By law, the transfer of the note

automatically transfers an equitable interest in the underlying mortgage, even without a formal

assignment.")  As the allonges to the Loans confirm, the assignments indeed occurred on

December 22, 2020, and HarborOne was still in possession of the Loans and Notes on the day

that it sent the default notices.  *See* Dec. 22 Letters at Exs. N & O ("Lender was and *is* entitled to

payment of interest on the outstanding balance of the Loan at the Default Rate . . . .") (emphasis

added); Allonges at Exs. P and Q (reflecting the December 22 assignment).  Accordingly, the

factual predicate for the Debtors' claims that SHS may not stand in HarborOne's place and

demand interest at the Default Rate from March 2017 is demonstrably false – HarborOne

demanded such while it was still in possession of the Loans.

Further, the Ninth Circuit authority, *In re Crystal Props., Ltd.*, on which the Debtors rely

for their claim that SHS can not accelerate payment or charge default interest for events of

default that occurred before assignment is not binding on this Court.  268 F.3d 743 (9th Cir.

2001).  Nor should it be persuasive because no court in this jurisdiction, nor any other court of

appeals outside of the Ninth Circuit, has adopted that authority in the twenty (20) years since its

publication.  Even if, *arguendo*, that authority applied herein, as noted in Point I, *supra*, under

the plain language of the Guaranties, Debtors have already agreed that the:

> Guaranteed obligations shall not be released, diminished, impaired,
> reduced, or otherwise affected by . . . . (a) [t]he . . . assignment of
> any part or all of the Loan Documents or Guaranteed Obligations or
> any other forbearance or agreement by Lender to accept a deferred
> payment or performance of any Loan Documents or Guaranteed
> Obligations[.]

Cl Payment Guaranty at Ex. F, § 11(a); TL Payment Guaranty at Ex H, § 11(a).  On its face, the plain language to which Debtors previously agreed (and then later ratified in the First Omnibus Amendments) precludes them from arguing that assignment of the Loans in any way impacted their obligations thereunder or SHS' rights attendant thereto.  Accordingly, to the extent the Debtors request a declaration that SHS cannot seek interest at the Default Rate based on the timing of the assignment, the Court should dismiss that claim as both precluded by the terms of the Loans and unsupported by plausible allegations in the Complaint.

The second set of allegations in apparent support of the Debtors' request for a declaration that SHS cannot seek interest at the Default Rate back to March 2017 pertains, in sum and substance, to their erroneous allegation that "[n]on-monetary defaults could not trigger the Default Rate."  *See* Compl. ¶¶ 67-70.  The Debtors allege that "HarborOne and SHS have based their right to collect interest at the Default Rate dating back to March 2017 on a non-monetary default, namely the failure to deliver the Initial Deposit[s totaling $1,000,000.00]. . . pursuant to Section 7.19 of the Construction Loan as additional security for the Construction Loan."  Compl. ¶ 68.  The plain language of the Loans however disproves the Debtors' contention that non-monetary defaults could not trigger the Default Rate.

Section 6 of the Notes provides for automatic acceleration of the Loans upon, *inter alia*, "the occurrence of any one or more of the Events of Default set forth in the Loan Agreement."  Compl. ¶ 66; *see also Notes* at, Exs. D & E § 6.  Events of Default are defined in § 9.1 of the Construction and Term Loans.  *See* Loans, Exs. B & C, § 9.1.  Section 7.19 of the Construction Loan, which obligated the Debtors to make deposits totaling $1,000,000.00 deposit in the event they failed to deliver certain ground leases, specifically states in subsection (f) that:

> [t]he failure of Borrower to comply with the requirements of [the subsections setting forth the ground lease and deposit obligations],

> by the dates specified therein shall constitute a non-monetary default
> to which <u>Section 9.1(b)</u> below shall apply in determining *when an
> Event of Default occurs with regard to the same*.

Construction Loan at Ex. B, § 7.19(f) (emphasis added). Nothing in the foregoing section, nor in

§ 9.1(b), or § 9.1 generally, provides that a non-monetary default does not constitute a full Event

of Default for which interest at the Default Rate may be assessed. *Id.*, § 9.1. Rather §§ 7.19(f)

and 9.1(b) merely operate to define the cure periods attendant to a failure by the Debtors under §

7.19, upon the expiration of which such a failure was deemed to have been an Event of Default

under § 9.1 (and thus the Notes). In addition to the fact that, as stated *supra* (Section II), the

Debtors expressly acknowledged that they were liable for default interest beginning on March 1,

2017 through their execution of the First Omnibus Amendments and waived any defense thereto,

these remaining predicate allegations in purported support of the Debtors' request for a

declaration that SHS may not seek interest at the Default Rate back to March 2017 are

demonstrably false and should not be credited by this Court.

    Based on the foregoing the Debtors' requests for declaratory relief fail both procedurally

and substantively and should be dismissed as a matter of law.

**VII.   THE DEBTORS' REQUEST FOR EQUITABLE SUBORDINATION OF SHS'
      CLAIM IS NOT YET RIPE NOR IS IT PLAUSIBLY ALLEGED**

    The Debtors have invoked 11 U.S.C. § 510(c) of the Bankruptcy Code to request that the

Court subordinate SHS' allowed claims to another allowed claim based on allegedly inequitable

conduct by SHS, HarborOne, and Michael Sullivan. *See* Compl. ¶¶ 82-106. At the outset, the

Debtors' claim should be dismissed as not yet ripe for adjudication because, as discussed above,

SHS has not yet filed its proof of claim(s). *See In re Comprehensive Power, Inc.*, 578 B.R. 14,

29 (Bankr. D. Mass. 2017) (dismissing requests for equitable subordination because no claims

had yet been filed and "[t]he great weight of authority is that '[§] 510(c) does not permit

subordination absent an allowed claim.'") (alteration in original) (quoting *In re Dreier LLP*, 452

B.R. 391, 451 (Bankr. S.D.N.Y. 2011) (further citation omitted)); *see also* 11 U.S.C. § 510(c)

(requiring, on its face, the existence of an "allowed claim" to be subordinated).  The Debtors'

request for equitable subordination therefore fails as a matter of law.

Substantively, the First Circuit has adopted the following three-prong test as the "gold

standard" to find equitable subordination under § 510(c): (1) "the claimant [must] be found to

have engaged in inequitable conduct[;]" (2) "the misconduct must have either resulted in injury

to creditors or given the claimant an unfair advantage[;]" (3) "equitable subordination of the

claim must not be in conflict with the provisions of federal bankruptcy law." *Merrimac Paper*

*Co. v. Harrison (In re Merrimac Paper Co.)*, 420 F.3d 53, 59 (1st Cir. 2005).  "Misconduct is a

prerequisite and determined on a case-by-case basis and conduct that shocks the conscience of

the court is required." *In re Comprehensive Power, Inc.*, 578 B.R. at 29 (quoting *In re*

*Wolverine, Proctor & Schwartz, LLC*, 447 B.R. 1, 44 (Bankr. D. Mass. 2011) (citing *In re 604*

*Columbus Ave. Realty Trust*, 968 F.2d 1322, 1361 (1st Cir. 1992)).  Taken as true (to the extent

they are not contradicted by documents), the Debtors' allegations do not shock the conscience

and their claims therefore fail.

First, the predicate allegations of fact (i.e., alleged inequitable conduct) for the Debtors'

claims against SHS are demonstrably false, and need not be credited by this Court even on a

motion to dismiss.  Specifically, the Debtors base their requests for equitable relief against SHS

on, *inter alia*, their claims that a non-monetary default could not give rise to imposition of the

Default Interest rate under the terms of the Loans and their claim that SHS could not seek that

interest at the Default Rate as demanded by HarborOne prior to assignment to SHS.  *See* Compl.

¶¶ 84, 86-87.  As discussed, *supra*, both of these contentions are flatly contradicted by

documents integral to the Complaint (and in the case of the latter contention, by other allegations within the Complaint as well). Thus, the Debtors have not plausibly alleged that SHS engaged in misconduct – let alone conduct that shocks the conscience – and their equitable subordination claims as based on those allegations should be dismissed.

The remaining factual allegations in purported support of equitable subordination of SHS' claims pertain to allegedly unlawful conduct by their attorney Michael Sullivan ("Sullivan"). *See* Compl. ¶¶ 96-99. The Debtors allege this conduct should be imputed first to HarborOne, then again to SHS. *See* Compl. ¶¶ 96-99. Even taken as true (where appropriate), these allegations neither amount to misconduct nor shock the conscience. Despite the Debtors' characterization of Sullivan as being "Ice's attorney" and any conflict implied as a result, he did not represent them in connection with negotiation of the Loans nor the First Omnibus Amendments, as evidenced by the notice provisions thereunder. *See*, *e.g.*, Construction Loan at Ex. B, notice provisions, § 11.11 (identifying "Steven L. Charlip, LLC . . . Attn: Steven L. Charlip, Esq." as the address to which copies of notices to Borrower – including Ice – were to be sent); First Omnibus Amendment to Construction Loan, at Ex. K, at notice provisions, § 11-12 (identifying "Rich May, P.C. . . . Attn: Sarah M. Wegman, Esq." as the address to which copies of notices to Borrower and Manager were to be sent). Rather, the Debtors had the benefit of separate counsel and do not allege otherwise. *See generally*, Compl. They also specifically allege that Sullivan represented to them that he screened himself from HarborOne's relationship and interactions with the Debtors, and they provide no allegations plausibly undermining that representation. *See* Compl. ¶ 22; *id.*, *generally*. Accordingly, Debtors' allegations of some inequitable malfeasance by Sullivan based on a purported dual role are contradicted by the allegations in the Complaint and documents underlying same.

Moreover, the Debtors allege that *they* sought to benefit from Sullivan's relationship with HarborOne, which they believed would keep the bank from enforcing its rights against the Debtors, notwithstanding the fact that Sullivan expressly represented to them that he as not involved in the Bank's decisions with regard to the Debtors' loans. *See* Compl. ⁋99. In other words, the Debtors would have this Court subordinate SHS' claim because the Debtors' attorney was true to his word to them and did not exercise undue, and inappropriate, influence over HarborOne on their behalf in order to forestall foreclosure (or the sale of the Loans) while the project was failing.  Clearly, such facts cannot support a plausible claim for equitable subordination under First Circuit law.

Indeed, the Loans were the product of arm's length dealings between separately represented parties and no misconduct occurred, let alone misconduct which would shock the conscience. *See In re 604 Columbus Ave.*, 968 F.2d at 1361 ("For the most part, courts have been reluctant to find the requisite level of misconduct in arms-length dealings between borrowers and lenders.").  To the extent Debtors genuinely take umbrage with Sullivan's conduct, their equitable claims should logically be pointed towards him, his law firm, and the creditor entity he manages.   Ashcroft and Sullivan, through their Sports Village Lender, LLC, are creditors with secured claims (although not yet filed) against Debtors.  *See* Compl. ¶ 20-21 (Ashcroft Sullivan is Sullivan's law firm and Ashcroft Sullivan Sports Village Lender, LLC, of which Sullivan is a member and manager, loaned $7,500,000 to Ajax 5Cap and "was granted second mortgages against each of the Debtors' real properties, with the exception of Land East, as security for that loan.")  Curiously, the Debtors do not impute Sullivan's conduct to him or the secured creditor he both manages and owns, and with whom there is no allegation that he separated his interactions with the Debtors, Ajax, or Silberberg.  The Debtors instead attempt to

impute his conduct to HarborOne – notwithstanding their separate counsel and Sullivan's representation that he separated himself from HarborOne's relationship with the Debtors.  They then seek to further impute whatever conflict to which that purportedly amounts to, to SHS for purposes of equitably subordinating the claims it has yet to file.  This is nonsensical and as discussed below, if, *arguendo*, the Debtors were to succeed on this claim,  the result would be wholly inequitable – and therefore fatally inconsistent with the purpose of equitable subordination and the third prong required to support their claims.

### A.  Any Subordination of SHS' Claim Would Inequitably Benefit Ashcroft Sullivan Sports Village Lender

Based on the documents which the Court may properly consider on a motion to dismiss, Ashcroft Sullivan's LLC appears to be Debtors' only other consensual secured creditor.  *See* Compl. ¶ 21 (Ashcroft Sullivan's LLC obtains a second mortgage against the Debtors' properties**);** First Omnibus Amendment to Construction Loan, at Ex. K, § 8 (amending and restating § 8.8 in its entirety to, *inter alia*, permit Ashcroft Sullivan's LLC to have the only other interest secured by Debtors' properties aside from the Loans).  Thus, if the Debtors were to succeed on their equitable subordination claim based on misconduct by Sullivan, imputed to HarborOne, then to SHS, the result would be that Ashcroft Sullivan's LLC (in which Sullivan is a member) would rise to become the first position, and only consensual secured creditor.  This outcome – wherein Sullivan directly and financially benefits from his purported misconduct – is inequitable on its face and fatally contradictory to the purpose of equitable subordination under 11 U.S.C. § 510(c).  *See In re Sunshine Three Real Estate Corp.)*, 426 B.R. 6, 21 (Bankr. D. Mass. 2010) ("the doctrine of equitable subordination 'is remedial, not penal, and should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct.'") (quoting *In re SubMicron Sys. Corp.*, 432 F.3d 448, 462

(3d Cir. 2006) (further citations omitted)).  The Court should therefore dismiss this claim as

failing to plausibly allege the first and third prongs of the three-prongs required for a claim of

equitable subordination.

**VIII.   THE DEBTORS' REQUESTS TO AVOID THE LAND EAST TRANSACTION FAIL
AS A MATTER OF LAW BASED ON THEIR FAILURE TO PLAUSIBLY ALLEGE
PROPER STANDING, INJURED CREDITORS, LACK OF REASONABLY
EQUIVALENT VALUE, AND INSOLVENCY**

The Debtors jointly contend that Land East's execution of the Land East Guaranty, Land

East Mortgage, Assignment of Leases, First Omnibus Agreement, UCC-1 to HarborOne are

avoidable as fraudulent transfers under G.L. 109A §§ 5, 6, 11 U.S.C. § 548, and that Land East

may recover the transferred property under 11 U.S.C. § 550, for the benefit of *its* estate pursuant

to 11 U.S.C. § 551.  Compl. ¶¶ 107-148.

The reality that this adversary proceeding arises from the fact six (6) separate bankruptcy

actions (joined for purposes of convenience) by six separate debtors with six separate estates is

largely ignored by the Debtors.  *See generally*, *id*.  Notwithstanding the group pleading of this

claim, only Land East, as the debtor in possession of *its* estate, has standing to bring these

claims.  *See*, *e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ("[A] party generally must

assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or

interests of third parties.")  Accordingly, this claim, as purportedly asserted by any debtors aside

from Land East, should be dismissed.

Moreover, these claims are problematic because Land East's encumbrance to its alleged

detriment was for the benefit of the other Debtors, Silberberg, and Ajax, all of whom were

already obligated under the Loans, Guarantees, etc.  In fact, assuming *arguendo*, that Land East

were to succeed on its claims to avoid its guarantee and mortgage on its property, because the

other Debtors received a significant benefit for the Omnibus Amendments, Land East could

recover against them as subsequent transferees under 11 U.S.C. §550. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 603 B.R. 682, 688 (Bankr. S.D.N.Y. 2019) (citing *Ames Merch. Corp. v. Nikko Am., Inc. (In re Ames Dep't Stores, Inc.)*, No. 01-42217 (REG), 2011 Bankr. LEXIS 991, 2011 WL 1239804, at *5 (Bankr. S.D.N.Y. Mar. 28, 2011)) ("Since the transfers made to BNP Paribas satisfied Legacy's obligations to BNP Paribas, Legacy was the entity for whose benefit those transfers were made within the meaning of 11 U.S.C. § 550(a)(1)").  Therefore, the plaintiffs herein have interests that are diametrically opposed, calling into question the propriety of these fraudulent conveyance claims being pursed in this case in the names of all the Debtors who are represented by common counsel.

Moreover, while the statutes under which Land East seeks relief vary somewhat, each requires, *inter alia*, plausible allegations that the Debtor received inadequate consideration for the transfer at issue.  *See* G.L. c. 109A § 5(2) (requiring transfer made or obligation incurred "without receiving a reasonably equivalent value in exchange"); *id.*, § 6(a) (same); 11 U.S.C. § 548 (a)(1)(B)(i) (requiring that debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation").  "To determine whether a debtor received reasonably equivalent value . . . . [t]he court should compare what was given with what was receive, taking into account both direct and indirect benefits." *Nickless v. Pappas (In re Prime Mortg. Fin., Inc.)*, BAP No. MW 10-035, 2011 Bankr. LEXIS 494, 2011 WL 4572006, at *4 (B.A.P. 1st Cir. Feb. 14, 2011).

The allegations set forth by the Complaint purportedly supporting the "less than reasonably equivalent value" prong of the above statutes are that "HarborOne advanced no funds to or for the benefit of Land East[,]" the conclusory allegation that "[t]he Debtors received little or no consideration in exchange for their agreements to amend Loan Agreements and provide

additional collateral to HarborOne[;]" and that "[t]he First Omnibus Amendment did not include a waiver of any defaults or an agreement by HarborOne to forbear from exercising any of its rights and remedies in connection with the Loans."  Compl. ¶¶ 34, 117.  Even taken as true, the non-conclusory allegations above do not establish that the conveyances were made without fair consideration – only that HarborOne did not advance funds to or for Land East, that none of the defaults were waived, and that HarborOne did not agree to any forbearance.  *See Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, 602 B.R. 208, 223 (Bankr. D. Mass. 2019) (dismissing claim for constructive fraudulent transfer where the complaint did not include any allegations concerning the value of the property transferred or the value received in exchange other than the allegation that the value received was less than the value of the property transferred).

Notwithstanding Debtors' misleading contentions to the contrary, they indeed received fair consideration for the transactions at issue.  The First Omnibus Amendments to the Loan Agreements executed in July 2020, *inter alia*, permitted the Debtors and their parent corporation, Ajax, to incur an additional $20,000,000.00 of debt, $7.5 million of which could be secured byway of a second mortgage on HarborOne's collateral (otherwise prohibited under the prior version of § 8.8 of the Loans).  *Compare* Construction Loan at Ex B, § 8.8, *with* First Omnibus Amendment to Construction Loan at Ex. K § 8.8; *compare* Term Loan at Ex. C, at § 8.8, *with* First Omnibus Amendment to Term Loan at Ex. L, § 8.8.  In other words, Debtors received the ability to obtain further financing and encumber the Property further without violating the Loans in exchange for an encumbrance on Land East's property.

Moreover, through the First Omnibus Amendments, Ice was permitted to lease its rooftop to a solar power producing company, GSPP NESV, LLC, which lease would immediately generate $250,000.00 in revenue for Ajax and/or the Debtors in addition to the monthly rents due

thereunder.  *See* Ex. K ¶8.12. Thus, the Debtors, including Land East, benefited from the

Omnibus Amendments, which resulted in an influx of cash and borrowing power to the Debtors

at a time when they were admittedly struggling due to the COVID-19 pandemic.

This foregoing consideration is confirmed and expanded upon by the plain language of

the Land East Guaranty.  Paragraph 2 of the Land East Guaranty is entitled "Consideration" and

states as follows:

> Guarantor [i.e., Land East] acknowledges that it has made this
> Guaranty to induce Lender to consent to the Loan Modifications,
> including its agreement to enter into the Guarantor Documents, in
> each case for the benefit of Borrower [i.e., Ice, Swim, Field, hotel,
> Tennis, and Land], and that Lender is consenting to the same in
> reliance upon this Guaranty and would not agree to consent to same
> without the appropriate execution and delivery of this Guaranty.
> Guarantor represents and warrants that Guarantor has a financial
> interest in Borrower and will receive substantial economic benefit
> by reason of Lender's having extended the Loan to Borrower and to
> consent to the Loan Modifications with respect to the Loan;
> provided, however, that Guarantor's Liability hereunder shall not be
> affected or impaired by Guarantor's disposition or loss of its
> financial interest in Borrower or by reason of Lender's refusal in
> accordance with the terms of the Loan Documents to fund any
> additional amounts of the Loan to Borrower.

Land East Guaranty at Ex. M, § 2.  "Under Massachusetts law, '[t]he words of a contract must be

considered in the context of the entire contract rather than in isolation.  When the words of a

contract are clear, they must be construed in their usually and ordinary sense.'"  *Kit-USA, Inc. v.*

*PayByClick Corp.*, No. 13-13280-FDS, 2014 U.S. Dist. LEXIS 87870, at *10-11 (D. Mass. June

27, 2014) (quoting *Brigade Leveraged Capital Structures Fund Ltd. v. PIMPCO Income Strategy*

*Fund*, 466 Mass. 368, 374 (2013) (quoting *General Convention of New Jerusalem in the U.S. of*

*Am., Inc. v. MacKenzie*, 449 Mass. 832, 835 (2007))).  Thus, by the plain language of, *inter alia*,

the Land East Guaranty, and a comparison of the Loan Documents with the First Omnibus

Amendments thereto, Land East indeed received fair consideration and benefit from the transaction.

Similarly, each of the above statutes requires Debtors to plausibly allege that the transferor, in this case Land East, was insolvent or rendered insolvent by the transfer to be avoided. *See* G.L. c. 109A § 5(a)(2)(i)-(ii) (requiring that the remaining assets would be "unreasonably small in relation to the business or transaction" or that the debtor "would incur[] debts beyond his ability to pay as they became due."); 11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III)[5] (requiring that the transfer either rendered debtor insolvent, left them with unreasonably small capital, or left them with debts beyond their ability to pay as they matured). Here, the sole non-conclusory allegation as to Land East's assets is that the Land East parcel is 33.9-acres and was unencumbered before July 2020. *Id.*, ¶ 99. Debtors have provided no allegations whatsoever on the value of the assets, business, expenses, or debts of Land East from which this Court could draw a plausible inference that Land East met the insolvency requirements of any of the above sections. *See generally*, Complaint; *see also*, *e.g.*, *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 49 (1st Cir. 2020) (finding insolvency plausibly alleged where approximate assets before the transfer were alleged and compared to the amounts of the allegedly fraudulent transfers and debt purportedly owed to the creditor); *see also In re Wojtkun*, 534 B.R. 435, 454 (Bankr. D. Mass. 2015) (finding insolvency plausibly alleged where debtor's assets and debts were both alleged). Accordingly, Debtors have failed to adequately plead their claims under G.L. c. 109A §§ 5, 6, and 11 U.S.C. § 548 and those claims should be dismissed as a matter of law. *See Springel v. Weisman (In re Innovative Commun. Corp.)*, Nos. 07-30012 (MFW), 09-

---

[5]    11 U.S.C. § 548(a)(1)(B)(ii)(IV) pertains to employment contracts and is therefore not colorable herein.

3089 (MFW), 2013 Bankr. LEXIS 1785, at *23 (Bankr. D.V.I. Apr. 26, 2013) (dismissing

constructive fraudulent transfer claims where the trustee-plaintiff "merely provide[d] a near-

verbatim recitation of the statutory elements of section 548 without providing any facts to

support the [t]rustee's assertion that New ICC was insolvent or became insolvent as a result of

the Transfers or that New ICC received less than reasonably equivalent value in exchange for the

Transfers.")

     Lastly, 11 U.S.C. § 544(b) permits trustees, or (as here) debtors in possession, to avoid

transfers or transactions of the debtor voidable that would be avoidable by an actual creditor

under applicable law.  *See generally*, 11 U.S.C. § 544; *Lassman v. Sergio (In re Sergio)*, 552

B.R. 9, 22 (Bankr. D. Mass. 2016) ("If there are no creditors against whom the transfer is

voidable under applicable law, the trustee is powerless to act under section 544(b)") (quoting

*Indus., Commer. Elec., Inc. v. Babineau (In re Indus., Commer. Elec., Inc.)*, Nos. 02-45451-JBR,

02-4591-JBR, 2004 Bankr. LEXIS 438, at *18 (Bankr. D. Mass. Apr. 7, 2004)).  The Complaint

provides no plausible allegations as to any creditors of Land East aside from SHS.  *See*

*generally*, Compl.  The only allegations pertaining to creditors of Land East are wholly

conclusory.  *See* Compl.  ¶ 123 ("Prior to and after such Transfers, a claim arose in favor of a

creditor of Land East."); ¶ 134 ("Prior to the Transfers, a claim had arisen in favor of a creditor

of the (sic) Land East.")  The Complaint has therefore not plausibly alleged Land East's standing

to act under § 544(b).

     Similarly, the applicable law under which these transfers are purportedly avoidable

through § 544 is G.L. c. 109A §§ 5 & 6, each of which requires a claim in favor of creditors

which arose before or after the transfer (under § 5) or before the transfer (§ 6).  *See In re Sergio*,

552 B.R. at 19, 22.  Thus, Debtors' failure to plausibly, rather than conclusory, allege the

31

existence of such creditors is fatal to their claims under these statutes, and those claims should be

dismissed.

## CONCLUSION

WHEREFORE, defendant SHS ACK, LLC respectfully requests that the Court GRANT

the Motion, DISMISS the Complaint and GRANT any other or further relief as it deems just and

proper.

> Respectfully Submitted,
>
> SHS ACK, LLC
>
> By its attorneys,
>
> /s/ *Thomas H. Curran*
> Thomas H. Curran, BBO# 550759
> tcurran@curranantonelli.com
> Peter Antonelli, BBO# 661526
> pantonelli@curranantonelli.com
> Christopher Marks BBO# 705612
> cmarks@curranantonelli.com
> Curran Antonelli, LLP
> Ten Post Office Square, Suite 800 South
> Boston, MA 02109
> Telephone: (617) 207-8670
> Fax: (617) 850-9001

Dated: November 22, 2021

## CERTIFICATE OF SERVICE

I, Thomas H. Curran, hereby certify that on this 22nd day of November 2021, a copy of

the foregoing was filed electronically.  Notice of this will be sent by e-mail to all parties by

operation of the Court's electronic filing system. Parties may access this filing through the

Court's system.

> /s/ *Thomas H. Curran*
> Thomas H. Curran