# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (EASTERN DIVISION)

|  |  |
|---|---|
| In re:<br><br>NESV ICE, LLC, *et al.*[1],<br><br>    Debtors. | Chapter 11<br>Case No. 21-11226 (CJP)<br><br>Jointly Administered |
| NESV ICE, LLC, NESV FIELD, LLC, NESV SWIM, LLC, NESV HOTEL, LLC, NESV LAND, LLC, NESV TENNIS, LLC, and NESV LAND EAST, LLC.<br><br>    Plaintiffs,<br><br>  v.<br><br>SHS ACK, LLC,<br><br>    Defendant. | Adv. Proc. No. 21-1093 |

## OPPOSITION TO MOTION TO DISMISS

The above-captioned plaintiff debtors (the "Debtors") hereby oppose SHS ACK,

LLC's ("SHS") Motion to Dismiss (the "Motion").

## INTRODUCTION

The Debtors' 148 paragraph complaint (the "Complaint") extensively details

SHS's bad-faith conduct and purchase-the-loan-to-own strategy that underlie the

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, are as follows: NESV Ice, LLC (1262), NESV Swim, LLC (5919), NESV Tennis, LLC (6937), NESV Land East, LLC (4138), NESV Field, LLC (5539), NESV Hotel, LLC (9151), and NESV Land, LLC (2353).

Debtors' claims. At bottom, it alleges a scheme by SHS to wrest control of the

Debtors' properties by using an unenforceable default interest rate—artificially

inflated by more than $5 million in charges retroactive to 2017—and the immediate

threat of foreclosure as leverage. The Complaint also includes detailed allegations

about the bad-faith conduct of SHS's predecessor-in-interest, HarborOne Bank

("HarborOne"), whose conduct is imputed to SHS. That conduct includes: (1) quietly

amending the Loan Documents, which had limited any assignment of the loans to a

"financial institution;" (2) secretly selling the loans to SHS; and (3) demanding 18%

default interest retroactive to March 1, 2017, in the midst of COVID, based on a

non-monetary default that could not trigger default interest pursuant to the

applicable notes. HarborOne accomplished this while the chairman of its own board

simultaneously served as Debtor NESV Ice, LLC's ("Ice") lead litigation counsel,

and owed Ice duties of undivided trust, fidelity, and loyalty. Those duties were

ignored while HarborOne secretly schemed with SHS to inflate the amount of

interest owed by the Debtors as part of their deal. That deal enabled HarborOne to

remove an underperforming borrower from its books and gave SHS unlawful

ammunition for its predatory foreclosure campaign.

Taken together, those detailed factual allegations, and the reasonable inferences

that may be drawn therefrom, provide more than sufficient heft to state claims

against SHS for its and HarborOne's heavy-handed conduct.

The competing facts SHS offers in support of the Motion are not the stuff of Rule

12. Its selective and self-serving interpretation of the applicable loan documents fare no

better. Instead, they expose deep flaws in SHS's position, and are largely predicated on

a mischaracterization of HarborOne's course of conduct. For these and other reasons

explained below, the Court should deny the Motion. Additionally, because the Motion

had no genuine chance of success, and is the latest example of SHS unnecessarily

driving up costs for the Debtors, the Court should consider awarding the Debtors their

costs and reasonable attorneys' fees incurred opposing the Motion.

## BACKGROUND

1.      On October 21, 2021, the Debtors filed a five-count Complaint against

SHS. Count I seeks declarations that the 18% per annum default interest rate in

the Notes is: (i) unenforceable; (ii) may not be collected retroactively to March 1,

2017; (iii) may not be collected for any period prior to January 2021; and (iv) that

the Notes at Section 5(a) are unenforceable under G.L. c. 271 § 49.

2.      Count II seeks equitable subordination of SHS's claims, in whole or in

part, based on the conduct described in the Complaint.

3.      By Counts III, IV, and V, Debtor NESV Land East, LLC ("Land East")

seeks to set aside and avoid mortgages and related transfers, collectively defined as

the "Transfers," it made to HarborOne in July 2020 (and which were subsequently

assigned to SHS) pursuant to which Land East pledged its assets (*i.e.*, its real

estate with a tax assessed value of $489,100) and became indebted for the principal

amount of $11,244,035.40 plus interest and related changes, but received little or no

consideration in return.

## LEGAL STANDARD

4.      Under Rule 12(b)(6) a claim may be dismissed when it asserts a legal theory that is not cognizable as a matter of law or because the factual tale alleged is implausible. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012). When a claim is challenged under Rule 12(b)(6), the Court construes the pleading liberally in the pleader's favor. *Kaltenbach v. Richards*, 464 F.3d 524, 526-27 (5th Cir. 2006). The Court presumes all well-pleaded allegations are true, resolves reasonable doubts and inferences in the pleader's favor, and views the pleading in the light most favorable to the non-moving party. *Twombly,* 550 U.S. at 555; *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 508 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). The allegations must "possess enough heft" to establish an entitlement to relief. *Twombly,* 550 U.S. at 555. The issue is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of its claim. *In re Yourelo Your Full-Serv. Relocation Corp.,* No. 19-13602-CJP, 2020 WL 6927549, at *2 (Bankr. D. Mass. Nov. 23, 2020) (citing *Twombly*, 550 U.S. at 563 n.8.).

## ARGUMENT

### I.  THE DEBTORS' REQUESTS FOR DECLARATORY RELIEF ARE RIPE AND PLAUSIBLY STATE AN ENTITLEMENT TO RELIEF

#### A.  SHS Filed a Proof of Claim against Each Debtor

5.      SHS's ripeness argument is moot because, on November 29th, it filed proofs of claim against each of the Debtors.[2] *See, e.g., In re Comprehensive Power, Inc.*, 578 B.R. 14, 29 (Bankr. D. Mass. 2017) (authorizing trustee to pursue equitable subordination claim if putative defendant filed a proof of claim). Amending the Complaint to reflect this development would serve no genuine purpose.

### B.      The Debtors Do Not Request a Valuation of SHS's Secured Claim

6.      The Debtors challenge the enforceability of default interest and, by extension, the extent of SHS's liens against the Debtors' property. *See* Fed. R. Bankr. P. 7001(2), (9). The Debtors' request for declaratory relief challenging the default interest rate is proper and is unrelated to valuing the property that secures a claim under § 506(a). Stated differently, the enforceability of the default interest provisions in the Loan Documents have no bearing on the value of the Debtors' real estate.

## II.    SHS's WAIVER ARGUMENT IS MISPLACED

### A.      The So-Called Waivers Do Not Say what SHS Says They Say

7.      SHS contends that the Court should dismiss all five Counts of the Complaint based on alleged waivers or rights and defenses by the Debtors. First and foremost, there is no support, and SHS has cited none, for its contention that the "Debtors expressly acknowledged that they were liable for default interest

---

[2] Moreover, unlike the putative defendant in *In re Comprehensive Power, Inc.*, which conducted a prepetition secured party sale and sought nothing from the estate, SHS has been the most active creditor in the Debtors' bankruptcies. SHS presumably knew when it filed the Motion (on November 22) that it would file proofs of claim by the November 29 bar date.

beginning on March 1, 2017 through their execution of the First Omnibus Amendments and waived any defense thereto." Doc. No. 5 at 21.

8.    The "waivers" the Debtors did execute, which SHS misconstrues, have no bearing on the enforceability of 18% default interest (*e.g.,* Doc. No. 6-3, § 9.4 "No act, failure or delay by Lender shall constitute a waiver of any of its rights and remedies" and Doc No. 6-6, § 16 "Guarantor hereby waives notice of the acceptance hereof, waives all notices to which Guarantor might otherwise be entitled by law, waives all defenses, legal or equitable or otherwise available to a Guarantor and waives presentment, demand for payment, notice of dishonor, protest, notice of nonperformance and notice of protest and nonpayment relative to the Loan").[3] Even if the Debtors had signed a "waiver" that had the effect SHS desires, the Court may still find that waiver to unenforceable. *E.g., Purcell v. Schweitzer*, 224 Cal. App. 4th 969, 975-76 (2014) (rejecting waiver clause and finding stipulated damages for breach of settlement agreement bore no reasonable relationship to the range of actual damages the parties could have anticipated from a breach of the agreement and was an enforceable attempt to circumvent public policy).

9.    The Debtors' acknowledgements in the First Omnibus Amendments are also inapposite. Although the Debtors acknowledged that certain defaults had occurred, the amendments say nothing about the rate or amount of interest owed.

---

[3] In citing guaranties in support of its waiver arguments, SHS ignores that the Borrowers (*i.e.,* Ice on the Construction Loan, and Swim, Hotel, Field, Tennis, and Land on the Term Loan) did not execute a corresponding Payment Guaranty, or agree to the within "waivers." Accordingly, this so-called waiver contained in the Payment Guaranty provides no obstacle to the Borrower(s) from contesting the 18% default interest rate.

The term default interest does not even appear in the First Omnibus Amendments. Instead, the parties simply acknowledged that certain events of default had occurred (the "Existing Defaults"), that those defaults had not been waived, and that "no claim, crossclaim or counterclaim, right of set-off, or defense, protest or objection exists with respect to any of the Existing Defaults or the Outstanding Obligations."[4] Doc. Nos. 6-11 and 6-12 at Section 19. In other words, apart from acknowledging the existence of defaults and HarborOne's preservation of unspecified rights, the First Omnibus Amendments contain no agreement or acknowledgment as to any amount or rate of interest owed.

### III.   THE COURT CAN REASONABLY INFER FROM THE ALLEGATION THAT $5,136,000 IN DEFAULT INTEREST CHARGES WERE ADDED ON DECEMBER 20, 2020 THAT THAT AMOUNT IS NOT A REASONABLE ESTIMATE OF DAMAGES

10.     The Court should reject the hyper-technical pleading arguments SHS makes in hopes of obscuring the clear guidance of *In re Charles Street African Methodist Episcopal Church of Boston*, 481 B.R. 1, 12-13 (Bankr. D. Mass. 2012) *aff'd OneUnited Bank v. Charles St. Afr. Methodist Episcopal Church of Bos.*, 501 B.R. 1 (D. Mass. 2013). That case teaches that the $5,136,000 in additional default interest charged by HarborOne and generated by "[t]he dramatic disparity between the rates of Default Rate (not less than 18%) and the non-default interest under the Notes (3.64% as of December 22, 2020) demonstrates that the Default Rate was not a reasonable forecast of damages, and is, instead, an unenforceable penalty."

---

[4] Neither the First Omnibus Amendments nor any of the other loan documents define "Outstanding Obligations." Accordingly, this language provides no support for the suggestion that the Debtors acknowledged an obligation to pay at least 18% default interest retroactive to March 1, 2017.

11.    SHS argues that in order to adequately plead that the default rate is an unenforceable penalty, the Debtors were required to articulate in their Complaint what a reasonable estimate of damages would have been when HarborOne made the loans.[5] In support thereof, SHS primarily cites cases that were decided at summary judgment or trial, not at the Rule 12 stage, and speak to the standard of proof, not pleading. The one exception is distinguishable. *See Reed v. Zipcar*, 527 F. App'x 20 (1st Cir. July 17, 2013). In *Zipcar*, plaintiff brought a consumer class action challenging Zipcar's $50 late fee, which was $25 more than comparable firms. The *Zipcar* court was unwilling to infer that Zipcar's "slightly higher" fee was grossly disproportionate to Zipcar's expected harm, particularly in view of plaintiff's "self-defeating" allegations supporting the inference that Zipcar's damages were difficult to predict. *Id.* at 23. Accordingly, the *Zipcar* court dismissed plaintiff's Chapter 93A claim.

12.    Here, the Court can reasonably infer that a minimum of 18% default interest – and the $5,136,000 in additional interest it generated – was not a reasonable forecast of damages. Indeed, this amount on its face is grossly disproportionate to any conceivable operating costs of HarborOne in carrying the loans, or other purported justification for setting minimum default interest at 18%,

---

[5] SHS overlooks the *Charles Street's* court observation that "the magnitude of the default rate is clearly relevant and, at some point, requires justification—a showing that what appears from its sheer magnitude to be a penalty was in fact a reasonable forecast of expected damages." *Charles Street*, 481 B.R. at 11. The allegations in the Complaint and all reasonable inferences that may be drawn therefrom comfortably fit within this scenario, and provide fair notice of the Debtors' claim.

as compared to 3.64% or any other applicable rate under the loans.[6] Indeed, it is reasonable to infer from the low non-default interest rate that HarborOne considered the risk factor associated with the Loans, secured by approximately 140 acres of real property, to be low.

13. As the Debtors also alleged, HarborOne separately charged "$138,980.56 in alleged costs and expenses."[7] Complaint, ¶ 45. Moreover, the Notes also contemplate a Late Charge of 5% of amounts due under each Note. Doc. No. 6-4, § 5(b). By its express terms, "[t]he Late Charge is intended to help defray the expenses incurred by Lender in handling and processing delinquent payments and to compensate Lender for the loss of the use of the funds constituting the delinquent payment."[8] *Id.; see also* Complaint, Ex. A (HarborOne December 31, 2020 statements showing late charges). The obligations to pay "Other costs and expenses" and the Late Charge of 5% further support the inference that paying a minimum of 18% default interest – which, here, yielded $5,136,000 in additional interest charges – was not a reasonable forecast of the lender's damages. The Debtors are entitled to present evidence in support of this claim.

---

[6] The Court also can reasonably infer that when the loans were executed in 2017, HarborOne anticipated that establishing 18% as the minimum default rate would greatly exceed the non-default rate of 3.5% plus LIBOR, which, between 2011 and 2020 averaged, approximately 1.314%.

[7] The Notes at Section 12, entitled "Lenders Costs, Including Attorney's Fees," provide that "Borrower agrees to pay or to reimburse Lender, as the case may be, on demand, for all reasonable fees, costs and expenses incurred or paid by Lender upon an Event of Default, on demand, for all reasonable fees, costs and expenses incurred or paid by Lender including, without limitation, all inspection, appraisal, examination and investigation fees and expenses; accounting, consulting, brokerage and other similar professional fees and expenses; and fees, costs and expenses imposed by law." Doc. Nos. 6-4, § 10; 6-5, § 12.

[8] Indeed, unlike the *Charles Street* court, which inferred that default interest not less than 5% above the floating prime rate would be sufficient to address these categories of damages (481 B.R. at 7), the Notes explicitly say that the 5% Late Charge is intended to cover those costs.

14.     The Court can further infer from the allegation that HarborOne did not demand payment of default interest until it sold the loans to SHS in December 2020 (Complaint, ¶ 43) that the additional $5,136,000 in default interest was not intended to address forecasted damages.[9] *Cf.* Complaint, Ex. A (HarborOne December 31, 2020 statements reflecting interest rates of 3.644% and 3.625%).

15.     In sum, the Debtors' have adequately pleaded that at the time of contracting, the minimum 18% default interest provision called for by the Notes did not represent a reasonable forecast of damages that the lender expected to suffer in the event of a breach. *E.g., Charles Street,* 481 B.R. at 11.

## IV.   SHS's ACKNOWLEDGEMENT THAT COMPOUND INTEREST IS UNLAWFUL DOES NOT END THE USURY INQUIRY UNDER COUNT I OR II OR THE DEBTORS' ABILITY TO PRESENT RELATED FACTS

16.     SHS appears to acknowledge that compound interest, as provided for under the Notes, violates the Massachusetts usury statute. Although SHS contends that the phrase "To the maximum extent permitted by applicable law" in Section 5(a) of the Notes settles the issue, discovery is required as to whether SHS acted in accordance with is fact-based arguments.

17.     The Debtors allege in the Complaint that SHS "refused to provide the Debtors with a detailed accounting of the alleged balances under the Loans, including its calculations of interest, instead telling the Debtors to do their own math." Complaint, ¶ 51. The letters cited by SHS in support of its argument that it

---

[9] The tax assessed values of the Debtors' properties support a further inference that a minimum of 18% default interest was grossly disproportionate to HarborOne's anticipated damages.

did not seek to charge usurious interest came from HarborOne, not SHS.[10] Doc. No

5 at 16-17 (citing Exs. I, J, N). Because SHS made foreclosure and other demands of

the Debtors, but never provided its own accounting to the Debtors, it is unclear

whether SHS's contract interpretation argument is consistent with its past

accountings (including those associated with its noticed foreclosure sales), or is

instead cover for unlawful practices.

18.    Moreover, SHS's proofs of claim include default interest *plus* attorneys'

fees[11] for the period following SHS's acquisition of the Loans to the Petition Date,

which total $1,576,047.80 and exceed 20% per annum "interest" on the principal

amounts of the Loans ($11,244,035.40) for that period. *Compare* Doc. Nos. 6-13 and

6-14 (reflecting default interest and other costs and expenses of $17,352,761.20 as of

December 20, 2020) *with* SHS's proofs of claim (reflecting default interest and other

costs and expenses of $18,928,809.20 as of August 26, 2021).[12]

19.    The Debtors have pleaded sufficient facts, taken together with

reasonable inferences from the Complaint and the documents presented by SHS, to

---

[10] HarborOne's calculations of interest and expenses at times appear to reflect amounts in addition to those in the December 2020 letters (the only quantification of default interest provided to the Debtors), like late charges (Complaint, Ex. A). Additionally, for reasons that remain unclear, HarborOne ascribed 100% of its "$138,980.56 "Other expenses and costs" to the larger Construction Loan. Discovery on HarborOne's calculations of interests, costs, attorneys' fees and late charges, all of which are properly considered under the usury analysis, is necessary. *See Begelfer v. Najarian,* 381 Mass. 177, 182-85 (1980).

[11] Attorneys' fees are properly considered as part of the interest and expenses calculation under G.L. c. 271 § 49(a). *See Begelfer,* 381 Mass. at 185-86; *In re Tavares,* 298 B.R. 195, 203 (Bankr. D. Mass. 2003).

[12] Twenty percent *per annum* interest between December 20, 2020 and August 26, 2021, based on a 360-day calendar (*see* Notes, § 3(b)) equals $1,555,424.90. A lender's violation of the usury statute, in charging interest and costs that together aggregate more than 20% of loan amount, is a *per se* "unfair or deceptive act or practice" in violation of Chapter 93A. *Pena v. Gonzalez,* 397 B.R. 566 (1st Cir. B.A.P. 2008); *In re Tavares,* 298 B.R. 195, 202-03 (Bankr. D. Mass. 2003).

enable them to obtain discovery and present evidence as to whether the "interest"

SHS actually sought to enforce (*e.g.,* as reflected in its real time internal documents

and communications reflect the accrual of compound interest, and considering the

fees and other expenses properly considered) in connection with its planned

foreclosure sales fell afoul of G.L. c. 271 § 49(a).

## V.   THE DEBTORS HAVE ADEQUATELY PLEADED A CLAIM FOR DECLARATORY JUDGMENT RELATING TO THE TIMING OF THE ASSIGNMENTS AND THE RETROACTIVE CHARGING OF DEFAULT INTEREST TO MARCH 1, 2017

### A.   The Complaint Alleges Inconsistencies Relating to the Timing of the Assignments

20.    SHS asks this Court to accept as true that HarborOne assigned its

rights to SHS on December 22, 2020, and to dismiss claims questioning the timing

of that assignment and the subsequent retroactive charging of default interest. In

doing so, SHS ignores the dates alleged in the Complaint, including the dates of

HarborOne's signatures, SHS's signatures, and attorney Thomas Curran's

signatures on behalf of SHS, which show a plausible and triable issue concerning

the date that HarborOne actually assigned its rights to SHS. Complaint, ¶¶ 38-48.

The documents SHS cites are not dispositive.[13] And the "alleged" December 22,

---

[13] Because the Debtors do not mention the allonges in the Complaint, they are not properly considered at the Rule 12(b)(6) stage. *E.g., Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009). The same is true for the Marx Affidavit (Doc. No. 6). *Id.* Notably, SHS chose not to present the Assignment and Assumption Agreement, which according to the allonges was the operative document in effectuating the transfer of the Loans to SHS. Doc. No. 6-16 ("*On or about the date hereof,* Assignor and Assignee entered into a certain Assignment and Assumption Agreement (the "Assignment Agreement") pursuant to which Assignor assigned to Assignee all of Assignor's right, title and interest in and to the Loan and to the Note and the other documents and instruments evidencing and securing the Loan (the "Loan Documents") . . . .").

2020 date of the assignment is the date that SHS, not the Debtors, allege that the assignment of rights occurred.

21.     The Debtors based their allegations on documents that are publicly available to them. SHS has never shared the assignment documents with the Debtors, including the Assignment and Assumption Agreement that is referenced in the Notices of Assignment that HarborOne signed on December 12, 2020. Complaint, ¶ 54. These allegations relate to the Debtors' declaratory judgment and equitable subordination claims. SHS cannot defeat those claims by simply promoting its own version of facts in a Rule 12(b)(6) motion. Moreover, SHS's curiously worded statement that HarborOne was "still *in possession* of the Loans and Notes on the day that it sent the default notices" (Doc. No. 5, p. 19) reinforces the Debtors' suggestion that HarborOne had already assigned its rights to SHS when HarborOne purported to accelerate payment and retroactively charge default interest. In other words, the Complaint plausibly alleges that HarborOne itself may have lacked authority to demand anything of the Debtors after assigning its rights. Complaint, ¶ 55. This is true whether HarborOne sent the December 22, 2020 demand letters ten days or ten minutes after assigning its rights to SHS.

22.     And even if HarborOne were "still in possession" of loan documents, that possession would not empower the assignee, SHS, to "accelerate payment or charge default interest for events of default that occurred before HarborOne

assigned its rights to SHS." Complaint, ¶ 56; *In re Crystal Props. Ltd.*, 268 F.3d 743 (9th Cir. 2001).[14]

23.    SHS's response merely highlights a dispute of fact, and the need for discovery and further development of the factual record on this claim, rather than justifying dismissal. The Debtors are entitled to present evidence in support of these claims.

> **B.    SHS's Automatic Acceleration Argument is Not Supported by the Loan Documents or HarborOne's Conduct as Alleged in the Complaint**

24.    SHS's attempt to use Section 6 of the Notes as a contractual escape hatch ignores the plain text of that provision. SHS seems to contend that all amounts due under the Loans, including default interest, *automatically accelerated and became due* in 2017 pursuant to Section 6. Once they became immediately due, the argument goes, but were not immediately paid, the lender could charge the default rate of interest under the applicable Note.

25.    That construction of the Notes, however, omits a critical component of Section 6, which provides that "the entire unpaid Principal balance of this Note and all accrued and unpaid interest thereon and all other fees, charges, costs and expenses hereunder shall become immediately due and payable, without demand, *at the sole option of Lender*" upon the occurrence of, inter alia, an event of default.

---

[14] SHS's reference to the Payment Guaranties is misplaced. The point is not that obligations could not be assigned, *per se*. The point is the Debtors had no obligation to pay default interest (and none had been demanded) before HarborOne assigned its rights, and after that SHS had no ability to demand default interest retroactive to March 1, 2017 on account of pre-assignment defaults.

Doc. No. 6-4 § 6 (emphasis added)  Acceleration, in other words, was not self-effectuating.[15]

26.    SHS, however, did not and cannot cite any document (much less any allegation in the Complaint) showing that HarborOne ever *exercised that option to accelerate the obligations under either Note*. Accordingly, at no time was any obligation accelerated pursuant to Section 6 of the Notes. *Cf.* Complaint, Ex. A (December 31, 2020 HarborOne statements reflecting applicable interest rates of 3.644% and 3.625%).

27.    SHS's arguments are also belied by HarborOne's conduct, as alleged in the Complaint. Unlike SHS, HarborOne never claimed that the Notes automatically accelerated pursuant to Section 6. Again, SHS cites no contrary support. Instead, as alleged in the Complaint, when HarborOne (and later SHS) did claim default interest was due, it referenced only 7.19 of the Construction Loan Agreement (not Section 6 of the Notes) as justification for charging default interest retroactive to March 1, 2017. *See* Complaint, ¶ 69;  Doc. No. 6-9 ("Please be advised that as a consequence of Borrower's failure to make (or cause to be made) the payment of the Initial Deposit when and as required pursuant to Section 7.19 of the Loan Agreement, Lender was entitled to payment of interest on the outstanding balance of the Loan at the Default Rate (as defined in the Note) as of March 1, 2017, five (5)

---

[15] Section 9.3(b) of the Construction Loan Agreement reinforces the conclusion that acceleration required an affirmative act by the lender. It provides that "Upon the occurrence of any Event of Default, Lender may, at Lender's sole and absolute discretion...(b) declare and cause all or any portion of any indebtedness due Lender to be immediately due and payable." This optional remedy would be superfluous if all indebtedness automatically accelerated under Section 6 the Construction Note, as SHS belatedly contends.

days after the date on which the Initial Deposit was to have been made."); Doc. No.

6-13 (citing § 7.19); Doc. No. 6-14 (same); Complaint, ¶¶ 26, 68-71.

28.    In interpreting contracts, courts may consider the parties' subsequent

conduct as there is often "no surer way to find out what the parties meant than to

see what they have done." *TLT Constr. Corp. v. RI, Inc.*, 484 F.3d 130, 136 (1st Cir.

2007). If doubt is cast on the meaning of a written document, it is construed against

the party that authored it – here, HarborOne, and by extension, SHS. *See Am.*

*Paper Recycling Corp. v. IHC Corp.*, 775 F. Supp. 2d 322, 328 (D. Mass. 2011).

29.    Moreover, First Circuit and Massachusetts case law supports the

Debtors' reading of the optional acceleration clause contained in Section 6 of the

Notes.

30.    In *Perry v. Wolaver,* 506 F.3d 48, 53 (1st Cir. 2007), the note holder

argued that the note principal automatically accelerated upon default as a result of

the following language: "a Default shall be deemed to have occurred under this

Note, and then, or at any time thereafter during the continuance of any such

Default, the entire unpaid balance of the Note together with any interest accrued

thereunder, shall, at the election of the Holders, and without Notice of such election

and without Demand or Presentment, become immediately due and payable." *Id.* at

51. The *Perry* court rejected the automatic acceleration argument as a "non-starter,"

holding that "this position is expressly contradicted by the Note, which makes

accelerating the principal merely an option [the note holder] could affirmatively

elect in the event of a default." *Id.* at 53. In other words, the *Perry* court rejected the

argument (the same one, at least implicitly, that SHS makes here) that the acceleration clause required no "notice," "demand" or "presentment," as a "rigidly literalist position [that] confuses legal 'notice' and practical business communication." *Id.* at 53, n. 5. The *Perry* court also offered the common-sense observation that, "given [the note holder] had the option of accelerating the Note in the event of a default, how would a defaulting debtor know the option was being exercised (and payment due) in the absence of a communication from [note holder]?" *Id.*

31.     Similarly, in *Clark v. Trumble*, 44 Mass. App. Ct. 438, 444–45 (1998), the court considered a substantially similar acceleration clause that contained the following language: "if default . . . is not made good prior to the date of the next installment, the entire principle [*sic*] sum and the accrued interest shall at once become due and payable without notice at the option of the holder of this note." In rejecting the argument that the note automatically accelerated, the *Clark* court explained that "[t]he clause at issue here provides that acceleration is at the *option* of the holder, which interjects the right of an election by the holder." *Id.* (emphasis original). The *Clark* court concluded that "[t]his language generally requires the holder to take some action to accelerate maturity, such as making demand for payment or filing suit." *Id.; see also Beal Bank S.S.B. v. Krock*, 201 F.3d 426 (1st Cir. 2000) (*citing Clark*, 44 Mass. App. Ct. 438) ("An event of default triggers acceleration, at the holder's option, but both the note and Massachusetts law require written notice first.").

32.     In view of the foregoing, SHS's post-hoc interpretation of Section 6 is meritless, and cannot possibly support dismissal at the Rule 12 stage.

33.     What is more, as the Complaint alleges further, because the failure to make the Initial Deposit contemplated by Section 7.19(d) of the Construction Loan Agreement is, by the express terms of that agreement, a non-monetary default,[16] it did not, absent an affirmative corresponding decision by the lender to accelerate and cause an actual payment default to occur, supply the basis for the application of default interest (Complaint, ¶ 70). Accordingly, the Debtors' Complaint plausibly states a claim for a declaration that SHS is not entitled to collect default interest retroactive to March 1, 2017.[17] Complaint, ¶ 77-79.

34.     By failing to squarely address this provision, and disingenuously ignoring the "sole option of Lender" language in the Notes at Section 6 (an option that no one has alleged was ever exercised), SHS continues to disregard a known contractual arrangement.

## VI.    THE DEBTORS' EQUITABLE SUBORDINATION CLAIM IS RIPE AND PLAUSIBLY STATES A CLAIM FOR RELIEF

35.     As stated previously, SHS's ripeness argument is moot because it filed proofs of claim against each of the Debtors on November 29, 2021. *See, e.g.,*

---

[16] Doc. No. 6-2, § 7.19(f) ("The failure of Borrower to comply with the requirements of <u>subsections</u> (<u>b</u>), (<u>c</u>), (***d***), and (e) as applicable, by the dates specified therein shall constitute a nonmonetary Default . . .") (emphasis supplied).

[17] Moreover, neither Section 6 of the Construction Loan Note nor Section 9.1 of the Construction Loan Agreement provide any support for charging default interest retroactive to March 1, 2017 under *the Term Note*, as demanded by HarborOne and SHS, based on a default under the Construction Loan Agreement.

*Comprehensive Power,* 578 B.R. at 29 (authorizing trustee to pursue equitable

subordination claim if putative defendant files a proof of claim).

36.     As SHS acknowledges, whether misconduct sufficient to justify

equitable subordination occurred "is determined on a case-by-case basis . . ." Doc.

No. 5 at p. 22. "The focus of the equitable subordination analysis is " 'the behavior of

the parties involved.'" *In re Wolverine, Proctor & Schwartz, LLC,* 447 B.R. 1, 43

(2011) (citations omitted). A court must determine whether the defendant "engaged

in some type of inequitable conduct, which resulted in injury to creditors or an

unfair advantage to it, and whether equitably subordinating its claim would be

consistent with the provisions of the Bankruptcy Code." *Id.* Here, the Debtors

adequately state a claim for equitable subordination.

37.     As a threshold matter, the Court should ignore SHS's factual

statements that the Debtors' claims "are false," that the "loans were the product of

arm's length dealings" or that Ice's attorney was "true to his word." They are not in

the Complaint and are not properly the subject of a Rule 12(b)(6) motion. *See Trans-*

*Spec Truck Serv., Inc. v. Caterpillar Inc.,* 524 F.3d 315, 321 (1st Cir. 2008)

(discussing court's discretion to ignore materials outside pleadings and not convert

motion to a motion for summary judgment).

38.     Moreover, in arguing that the Debtors have not plausibly alleged

misconduct, SHS ignores the text of the Complaint, including its opening

paragraph:

> the equitable subordination of SHS's claim based on its inequitable
> conduct, including its demand for payment of default interest to which

it was not entitled, leveraging such amounts in service of a loan-to-own
strategy that prioritized foreclosure over honoring the covenants of
good faith and fair dealing in its business dealings with the Debtors.

*See also* Complaint, ¶ 84.

39.     In the 148 paragraphs that follow, the Debtors elaborate on the

challenged conduct, which included:

   a.  SHS secretly purchasing the Loans (Complaint, ¶¶ 37, 48);

   b.  Material and consequential inconsistencies relating to the date
       HarborOne assigned its rights to SHS (*id.*, ¶¶ 38-41);

   c.  SHS, on information and belief, conditioning its purchase of the loans
       on HarborOne retroactively charging 18% default interest back to
       March 1, 2017 (*id.*, ¶ 42);

   d.  HarborOne's and SHS's wrongful demands for default interest
       retroactive to March 1, 2017 in known disregard of the contract
       documents (*id.*, ¶¶ 43-47, 54-75, 86-95);

   e.  SHS's continuing efforts to enforce an unenforceable penalty (*id.*,
       ¶¶ 45-59);

   f.  SHS publicly announcing its intent to foreclose, which harmed Ice's
       operations (*id.*, ¶¶ 49-50);

   g.  SHS's predatory practices in leveraging its position as secured lender
       to initiate foreclosure sales and force the Debtors to adhere to its
       unreasonable demands or file for bankruptcy protection (*id.* ¶ 52, 85,
       89-90);

   h.  Orchestrating a plan to strip the Debtors of valuable assets for well
       below market prices (*id.*, ¶ 88);[18] and

   i.  SHS's refusal to provide a detailed accounting to the Debtors, instead
       telling the Debtors to do their own math to determine what their
       alleged obligations to SHS were (*id.*, ¶ 51).

---

[18] The Complaint also noted that SHS's August 3, 2020 Certificate of Organization indicates that the
general character of its business "IS TO OWN, MANAGE AND DEVELOP REAL ESTATE" and to
engage in other lawful acts or activity "NECESSARY OR INCIDENTAL TO THE FOREGOING."
Complaint, ¶ 88.

40.     All of the foregoing resulted in harm to the Debtors (*id.,* ¶ 91).

41.     The Debtors also detail the wrongful conduct of HarborOne, SHS's predecessor in interest, Ice's special relationship with the chairman of HarborOne's board and related duties owed to Ice, which are imputed to SHS.[19] Complaint, ¶¶ 19-42, 96-103.

42.     Taken together, the Debtors have plausibly stated a claim for equitable subordination. *See* Doc. No. 5 at p. 22 (*citing* alleged "gold standard" for equitable subordination).[20] The alleged purchase, the loan-to-own scheme, the secret sale, overreaching tactics, the use of an unenforceable default interest rate (inflated by millions of dollars, retroactive to March 2017) as leverage to foreclose during a pandemic, coupled with the conflicted position of Sullivan, the chairman of SHS's predecessor in interest, and related breaches and failure to disclose HarborOne's and SHS's secret plans, all which are imputed to SHS, sufficiently shock the conscience to survive a Rule 12(b)(6) motion.

---

[19] SHS's glib dismissal of the myriad conflicts of interest, and its suggestion that attorney Michael Sullivan's simultaneous representation of two lenders and a borrower was entirely appropriate, is telling. It also ignores the allegations concerning the December 2020 secret sale of the loans to SHS and retroactive charging of default interest of more than $5,000,000 dating back to March 1, 2017. Although SHS apparently contests the reasonableness of the Debtors' expectations vis-à-vis Sullivan, that contest is a dispute of fact.

[20] SHS's concerns about Ashcroft Sullivan Sports Village Lender, LLC benefiting from equitable subordination are speculative and premature. In any event, those concerns provide no basis to dismiss the Debtors' claims against SHS.

## VII.   LAND EAST PLAUSIBLY STATES FRAUDULENT TRANSFER CLAIMS[21]

43.     SHS's principal challenge to Land East's fraudulent transfer claims is based on competing facts, and should be rejected. More specifically, SHS challenges Land East's fraudulent transfer claims based on what it contends was adequate consideration that flowed to the other Debtors. Doc. No. 5, p.26. SHS also challenges the allegations concerning the consideration Land East received in exchange for the Transfers (as defined in the Complaint), including the upstream and cross stream guaranties and the mortgage on its previously unencumbered 33.9-acre parcels, made four years after HarborOne extended loans to the other Debtors. Doc. No. 5 at 27.

44.     By contrast, Land East alleges that it received no funds, and little or no consideration for the Transfers. Complaint, ¶¶ 111, 117. Far from conclusory, the allegations reflect the reality of the transaction -- Land East encumbered its property with millions of dollars of secured debt, and got nothing in return.

45.     Land East also alleged that, as to the other Debtors, HarborOne did not waive any defaults or agree to forbear from exercising any of its rights and remedies in connection with the Loans pursuant to the July 2020 First Omnibus Amendment. *Id.* ¶ 34.

---

[21] It is reasonably clear from the Complaint, and easily inferred, that only Land East asserts fraudulent transfer claims against SHS. *E.g.,* Complaint, Counts III to V ("Land East may avoid" . . . "Land East may recover").

46.    Because SHS, at best, raises disputes of fact that are not properly

resolved at the Rule 12(b)(6) stage, the Court should disregard its

counterarguments about the adequacy of consideration.[22]

47.    Moreover, against the backdrop of these bankruptcy cases, SHS's

complaint about Land East not stating the value of its previously unencumbered

33.9-acre property is remarkable. SHS knows from its extensive efforts contesting

the Debtors' use of cash collateral, from Stuart Silberberg's first day affidavit, and

from Land East's statement of financial affairs, that the assessed value of the Land

East property is $489,100. Case No. 12-11226, Doc. No. 11, ¶ 18. SHS also knows

that Land East is not an operating debtor and that, apart from a *de minimis*

amount of cash, the real estate is its only asset.[23]

48.    The Complaint alleges the principal amounts of the HarborOne loans,

and the alleged amount of default interest owed. Complaint, ¶¶ 13, 14. Reading

those allegations together with those alleging that the Land East property was

encumbered as collateral for such debts (with principal amounts exceeding

$11,000,000) adequately pleads that Land East: (i) was made insolvent as a result

of the Transfers, (ii) was engaged or was about to engage in a business or a

transaction for which the remaining assets of Land East were unreasonably small

---

[22] SHS's contention that the July 2020 First Omnibus Amendments "permitted the Debtors and their parent company, Ajax, to incur an additional $20,000,00 of debt" is wrong. Doc. No. 5 at p. 28. Ajax (and only Ajax) entered into that $20,000,000 loan agreement with Ashcroft Sullivan Sports Village Lender, LLC ("AS SVL") *in November 2016*, and AS SVL recorded a mortgage against the Debtors' (other than Land East) properties on February 14, 2020 to secure payment of up to $7,500,000 of that loan.

[23] Although it should not be necessary, any conceivable pleading deficiency could be addressed through an amendment of the Complaint.

in relation to the business or transaction, and (iii) reasonably should have believed that, as a result of the Transfers, it would incur debts beyond its ability to pay as they became due. Stated differently, SHS is on fair notice that subjecting Land East's only asset to HarborOne's loans, mortgage, and other encumbrances rendered Land East insolvent.

49.     Lastly, SHS also is on fair notice that Land East pays taxes to the City of Attleboro, which was a creditor of Land East prior to and after the Transfers. To the extent necessary, a simple amendment of the Complaint could cure any perceived deficiency as to the existence of a creditor.

50.     In sum, the Complaint, together with all reasonable inferences that can be drawn therefrom, "contains enough factual detail to make it apparent that the plaintiff's claims are far from 'groundless.'" *Foisie v. Worcester Polytechnic Inst.,* 967 F.3d 27, 51 (1st Cir. 2020).

[*Remainder of this page intentionally left blank*]

## CONCLUSION

For all the foregoing reasons, the Court should deny the Motion, and grant

the Debtors such other and further relief as this Court deems just and proper.


Respectfully Submitted,

NESV Ice, LLC, NESV Swim, LLC, NESV
Tennis, LLC, NESV Land East, LLC, NESV
Field, LLC, NESV Hotel, LLC, and NESV
Land, LLC

By their attorneys,


*/s/ William S. McMahon*
Joseph M. Downes III (BBO No. 655853)
William S. McMahon (BBO No. 651832)
Downes McMahon LLP
215 Lewis Wharf
Boston, MA 02110
(617) 600-6430
jdownes@dmlawllp.com
wmcmahon@dmlawllp.com

Dated: December 6, 2021


## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed on December 6, 2021
through the Court's CM/ECF system and will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF),
including counsel to defendant SHS ACK, LLC.

*/s/ William S. McMahon*
William S. McMahon