**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| In re:<br><br>NESV ICE, LLC, *et al.*[1]<br>     Debtors<br><br>NESV ICE, LLC, NESV FIELD, LLC,<br>NESV SWIM, LLC, NESV HOTEL,<br>LLC, NESV LAND, LLC, NESV<br>TENNIS, LLC and NESV LAND<br>EAST, LLC<br>     Plaintiffs<br>v.<br><br>SHS ACK, LLC,<br>     Defendant | Chapter 11<br>Case No. 21-11226-CJP<br><br>Jointly Administered<br><br><br><br><br><br><br>Adv. Pro. No. 21-1093-CJP |

**MEMORANDUM OF DECISION AND ORDER**

**I.** **Introduction**

  In a five count complaint (the "Complaint"), the Debtors seek (i) entry of a declaratory judgment that the default rate of interest of 18% per annum provided for by the loans and notes held by the defendant, SHS ACK, LLC ("SHS" or "Defendant"), is unenforceable and/or may not be collected from March 1, 2017 ("Count I"); (ii) equitable subordination of the debt the Debtors owe to SHS ("Count II"); and (iii) avoidance and recovery of certain transfers made by NESV Land East, LLC ("Land East") to SHS's predecessor in interest, HarborOne Bank

---

[1] The debtors in the jointly administered chapter 11 cases, along with the last four digits of each debtor's tax identification number, and the plaintiffs in this adversary proceeding (the "Adversary Proceeding") are as follows: NESV Ice, LLC (1262), NESV Swim, LLC (5919), NESV Tennis, LLC (6937), NESV Land East, LLC (4138), NESV Field, LLC (5539), NESV Hotel, LLC (9151), and NESV Land, LLC (2353) (collectively referred to as the "Debtors" or "Plaintiffs").

("HarborOne" or the "Lender"), pursuant to Mass. Gen. Laws. ch. 109A, §§ 5, 6 and 11 U.S.C. § 548 ("Counts III–V").[2]  SHS moves to dismiss (Dkt. No. 4) (the "Motion") all counts of the Complaint under Fed. R. Civ. P. 12(b)(6), as made applicable by Fed. R. Bankr. P. 7012(b).  For the reasons below, I DENY the Motion in part and GRANT the Motion in part, with leave for the Debtors to amend the Complaint.

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court presumes all well-pleaded allegations are true, resolves reasonable doubts and inferences in the pleader's favor, and views the complaint in the light most favorable to the non-moving party. *See Twombly*, 550 U.S. at 555.  The allegations must "possess enough heft" to establish an entitlement to relief and require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action[.]" *Id*.  The issue is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of its claim.  *Id*. at 563 n.8.

"Under Rule 12(b)(6), the [trial] court may properly consider only facts and documents that are part of or incorporated into the complaint . . . . " *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).  "From this rule, the First Circuit makes 'narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff['s] claim; or for documents sufficiently referred to in the complaint.'" *Lowenstern v. Residential Credit Sols.*, No. CA 11-11760-MLW,

---

[2] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code" or the "Code").

2

2013 WL 697108, at *3 (D. Mass. Feb. 25, 2013) (quoting *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993)). "When . . . a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16–17 (1st Cir.1998); *see also Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (holding that, in ruling on a motion to dismiss, a court "'may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment.'" (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). "When such documents contradict an allegation in the complaint, the document trumps the allegation." *Lowenstern*, 2013 WL 697108, at *3 (citation omitted).

### III. Discussion

#### A. Count I (Declaratory Judgment – Claim for Default Interest)

Count I of the Complaint seeks entry of a declaratory judgment that SHS improperly claims a right to payment of default interest. In essence, it is a limited objection to what was, at the time of the filing of the Complaint, the anticipated proof of claim of SHS.[3] The Debtors

---

[3] SHS had not yet filed its proof of claim when the Debtors commenced the Adversary Proceeding. SHS subsequently filed a secured proof of claim (the "Claim") in the amount of $18,928,809.92 (the "Claim"). SHS had initially argued in the Motion that under both Fed. R. Bankr. P. 3007 and 7001(2) that a request for declaratory relief which would determine the amount of SHS's secured claim would be both improper in the context of an Adversary Proceeding and generally premature in the absence of a claim having been filed against the Debtors' estates. SHS agreed on the record at the hearing on the Motion that now that it has filed the Claim, it no longer had a procedural objection to the declaratory judgment count, since an objection to claim may be asserted in an adversary proceeding pursuant to Fed. R. Bankr. P. 3007(b) and Count I is essentially an objection to the default interest components of the Claim. After the Motion had been taken under advisement, the Debtors separately objected to the Claim (Bankr. Dkt. No. 270) (the "Claim Objection") and that matter has been consolidated with the Adversary Proceeding. *See* Ord. (Bankr. Dkt. No. 285). The deadline for SHS to respond to the Claim Objection has been stayed pending

3

assert five theories as to why SHS is not entitled to claim the amount of default interest that it has asserted: 1) the applicable loan documents do not provide for the accrual of default interest as claimed by SHS; 2) HarborOne "agreed" not to demand the payment of default interest for some or all of the claimed accrual periods prior to its assignment of the loan to SHS; 3) the claimed default interest is unenforceable under applicable law as a penalty; 4) HarborOne failed to demand payment of default interest prior to the assignment of the loans to SHS; and 5) the claimed default interest and loan terms violate Mass. Gen. Laws. ch. 271, § 49, the general criminal usury statute.  These legal theories are not described this way in the Complaint and were more fully set out in the Debtors' response to the Motion and in argument.  I must determine whether the Complaint, itself, contained sufficient factual allegations to state a plausible claim for relief.

The Complaint references numerous documents that were not attached as exhibits.  In connection with its Motion, SHS filed the Affidavit of Christopher Marks [Dkt. No. 6] (the "Marks Affidavit") and attached loan documents and notices, many of which appear to be referenced in the Complaint.[4]  SHS has asserted that I should consider these documents in

---

resolution of the Motion.  As the Debtors have been granted leave to amend certain aspects of the Complaint, including Count I to correct stated deficiencies, the Debtors shall incorporate the Claim Objection into their amended complaint.

[4] On or about June 24, 2016, HarborOne, SHS's predecessor in interest, made loans to certain of the Debtors including a construction loan in original principal amount of $9,506,000 (the "Construction Loan" or "Construction Loan Agreement") and a term loan in the principal amount of $1,960,000 (the "Term Loan" or "Term Loan Agreement") (together, the "Loans").  With respect to the Construction Loan, NESV Ice, LLC ("Ice") was the borrower and the remainder of the Debtors, other than Land East initially, were corporate guarantors, along with Ajax 5Cap NESV, LLC.  Stuart Silberberg guaranteed the Construction Loan individually. The borrowers regarding the Term Loan were the Debtors, other than NESV Ice, LLC ("Ice") and Land East.  Ice was a corporate guarantor, along with Ajax 5Cap NESV, LLC, and Stuart Silberberg guarantied the Term Loan individually.

The only documents attached to the Complaint as Exhibit A were account statements as of December 31, 2020 from HarborOne regarding the Construction and Term Loans.

deciding the Motion. In ruling on the Motion, I must consider the Complaint and the documents attached to it, as well as other materials fairly incorporated within it, including documents referenced in the Complaint, but that are not attached to it. *See, e.g., Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 2004) (concluding that "[i]n ruling on whether a plaintiff has stated an actionable claim, an inquiring court, be it a trial or appellate court, must consider the complaint, documents annexed to it, and other materials fairly incorporated within it[; t]his sometimes includes documents referred to in the complaint but not annexed to it" (citations omitted)); *Beddall*, 137 F.3d at 16–17. Given that there does not appear to be any dispute as to the authenticity of the documents attached to the Marks Affidavit or that certain of those documents are referenced or relied on in the Complaint, I have considered such documents in determining the Motion.[5]

The parties fundamentally disagree on the interpretation of certain critical provisions of the loan documents that govern SHS's entitlement to default interest. After considering the terms of the Construction Loan Agreement and related promissory note, the Complaint states a

---

Copies of the Construction Loan Agreement and Term Loan Agreement are attached to the Marks Affidavit as Exhibits B and C, respectively. Copies of the promissory notes evidencing the Construction Loan and Term Loan obligations are attached to the Marks Affidavit as Exhibit D (the "Construction Note") and Exhibit E (the "Term Note"), respectively. The Marks Affidavit also attaches copies of guaranties executed by certain Debtors and non-debtors (Exhibits F, G, and H) and default letters sent by the Lender dated April 10, 2019 regarding the Construction Loan (Exhibit I), August 2, 2019 regarding the Term Loan (Exhibit J), and December 22, 2020 with respect to both loans (Exhibits M and Exhibit N).

Land East subsequently became obligated as an additional guarantor on the Loans in connection with certain amendments executed on or about July 24, 2020, *see* First Omnibus Amendment to Loan Agreement and Other Loan Documents as to the Construction and Terms Loans, Marks Affidavit Exhibits K and L, and as described in Part B(iii), *infra*.

[5] The Court declines to consider certain allonges to the Construction Note and Term Note dated December 22, 2020 submitted by SHS as Exhibits O and P to the Marks Affidavit, as they were not otherwise referenced in the Complaint and appear to relate to an Assignment and Assumption Agreement between HarborOne and SHS which is not part of the record.

plausible claim that SHS's claim is overstated as to default interest. It appears undisputed that Ice, the "Borrower" under the Construction Loan Agreement failed to comply with § 7.19(d) of the agreement because it did not deposit, or cause NESV Swim, LLC to deposit, an initial deposit of $200,000 with HarborOne after failing to obtain a certain ground lease as required by the anniversary date set forth in that section of the agreement, which amount was to have been held by HarborOne in a separate escrow account defined as the "Ground Lease Escrow Account."[6] Constr. Loan Agreement, Marks Aff. Ex. B, § 7.19(a)–(e), (f). Any funds held in the Ground Lease Escrow Account "from time to time" were to constitute additional collateral for the Construction Loan unless advanced by the Lender "in its sole discretion" to be applied to missed payments. *Id*. § 7.19(d).

Section 7.19(f) of that agreement provides that the failure of the Borrower to comply with the requirements of § 7.19(d), among others, would be a "nonmonetary default" to which § 9.1(b) would apply. *Id*. § 7.19(f). In relevant part, § 9.1(b) of the Construction Loan Agreement states that the failure of the Borrower to perform any covenant within any grace period provided under the Loan documents would constitute an "Event of Default" if not cured within thirty (30) days of a "notice of such failure" sent by the Lender, or for "such additional number of days, not to exceed a total of ninety (90) consecutive calendar days after the date on which notice of such failure is sent," subject to certain additional conditions set forth in § 9.1(b). *Id*. § 9.1(b). There is no reference to or allegation of a notice of default having been sent in the Complaint. SHS has filed a copy of the letter dated April 10, 2019, that notifies Ice of a number of nonmonetary

---

[6] The required deposits in escrow would increase by an additional $800,000, for a total of $1 million, if the ground lease was still not obtained by a later anniversary date and the "Debt Service Coverage Ratio" was less than 1.65:1. Alternatively, under those circumstances, the Borrower could paydown the principal of the Construction Loan by $800,000, instead of making a further $800,000 deposit. *See* Constr. Loan Agreement, Marks Aff. Ex. B, § 7.19(e); 4/10/2019 Letter, Marks Aff. Ex. I, 2.

6

defaults and asserts a right to default interest commencing March 1, 2017, based on the Borrower's default under § 7.19 of the Construction Loan Agreement for failure to make the $200,000 initial deposit.  4/10/2019 Letter, Marks Aff. Ex. I, 2–3.  In the letter, the "Lender agrees, as an accommodation to Borrower, not to demand payment of additional interest at the Default Rate from such date forward but nevertheless reserves its right to demand payment of the same and to pursue its remedies related thereto at a later date as it may determine to be advisable in its sole discretion." *Id*. 3.  While the Debtors assert that this language clearly establishes an agreement by the Lender not to accrue default interest, it is unclear that the Lender had any right on that date to charge default interest based on the specific declared default, let alone retroactive to March 1, 2017.  In its letter dated December 22, 2020, the Lender demanded payment of default interest that it asserted had accrued since March 1, 2019. 12/22/2020 Letter, Marks Aff. Ex. M.

Section 5(a) of the Construction Note provides (in addition to any applicable late charges referenced in § 5(b)): "To the maximum extent permitted by applicable law, Principal, interest and other fees, charges, costs and expenses not paid when due shall accrue interest, payable on demand, from and after the date which is five (5) consecutive calendar days following the date when due until the date when actually paid at the Default Rate."  Constr. Note, Marks Aff. Ex. D, § 5(a).  It is unclear from the documents that the $200,000 to have been paid into a Ground Lease Escrow Account constituted "Principal, interest [or] other fees, charges, costs and expenses" or that, if it did, default interest would only accrue on the $200,000 to have been paid into escrow after proper notice upon an Event of Default.[7]  *Id*.

---

[7] HarborOne specifically acknowledged in the August 10, 2019 letter that as a temporary accommodation to the borrower monthly payments of principal were not provided for in invoices sent to the borrower after June 24, 2018, but that beginning with the July 24, 2019 Monthly Payment Date and on each Monthly Payment Date thereafter, each monthly payment shall now provide for payment of the Principal

7

SHS argues that the occurrence of an Event of Default triggered acceleration of all amounts due under the Construction Note, and, as such, default interest would accrue on all outstanding amounts under that note. As discussed, an Event of Default may not have occurred until 30 days after April 10, 2019. Additionally, it is not clear from the terms of the Construction Note that the obligations thereunder would have been "automatically" accelerated upon an Event of Default. Section 6 of the Construction Note provides that the "entire unpaid Principal balance of this Note and all accrued and unpaid interest thereon and all other fees, charges, costs and expenses hereunder shall become immediately due and payable, without demand, at the sole option of Lender, upon the earlier of (a) the Maturity Date, or (b) the occurrence of any one or more of the Events of Default set forth in the Loan Agreement." *Id*. § 6. The Complaint does not allege that the Lender provided notice of any acceleration, and SHS provides no document, other than the December 22, 2020 letter, that could be construed as a notice of acceleration or a demand for payment of all amounts due under the Construction Note. The language of § 6 of the Construction Note arguably requires an act by the Lender to exercise its option to accelerate all indebtedness upon the occurrence of an Event of Default. *See Perry v. Wolaver*, 506 F.3d 48, 53–54 (1st Cir. 2007) (applying Maine law and rejecting creditor's assertion that late payment automatically accelerated note without notice as being expressly contradicted by the note at issue, which made acceleration an option creditor could affirmatively exercise in the event of a default and that creditor's conduct in sending a notice letter that only sought default rate interest and late fees made clear that creditor did not accelerate the note or reflect a belief by the creditor that the note had been automatically accelerated); *Beal Bank S.S.B. v. Krock*, 201 F.3d 426, 2000 WL 18959, *2 (1st Cir. 2000) (unpublished table decision) (stating that "[a]n event of default

---

amount calculated with reference to the LIBOR Rate (as Borrower did not make an election to change the Interest Rate on the First Conversion Date) due on each such date." 4/10/2019 Letter 3.

triggers acceleration, at the holder's option, but both the note and Massachusetts law require written notice first.") (citing *Clark v. Trumble*, 692 N.E.2d 74, 79 (Mass. App. Ct. 1998)); *Clark*, 692 N.E.2d 74, 79 (Mass. App. Ct. 1998) (contrasting self-executing acceleration clause, providing as an example, "[f]ailure to pay any instalment as the same becomes due shall render the entire obligation then due and payable," with acceleration clause including language that it is at "the *option* of the holder, which interjects the right of an election by the holder. This language generally requires the holder to take some action to accelerate maturity, such as making demand for payment or filing suit" (emphasis in original)  (citations and internal quotations omitted)); *Butter v. Melrose Sav. Bank*, 435 N.E.2d 1057, 1057 (Mass. App. Ct. 1982) (determining that "[a]cceleration requires a positive act, but the act may consist of an unequivocal declaration by a mortgagee to a mortgagor that he is exercising the option.") (citations omitted).  While inconsistent with the language that the obligations under the note will "become immediately due and payable, without demand," the discretion reserved by the Lender leaves open the question of whether the Lender exercised its "option." Constr. Note, § 6.  SHS has not provided any document referenced in the Complaint that acknowledges that the obligations under the Construction Note were accelerated or is consistent with that position that would support its request for dismissal of Count I.

SHS also argues that the Debtors have executed multiple waivers of the relief they now seek.  These waiver arguments are unavailing.  The common suretyship defense waivers and other waivers in the original loan documents do not operate to foreclose a claim or defense to a subsequent miscalculation of interest under the terms of the documents or a claim by a bankruptcy estate that a stated interest rate is unenforceable as an improper penalty under applicable law.  Moreover, the acknowledgement of defaults provided in the First Omnibus

9

Construction Loan Amendment and the First Omnibus Term Loan Amendment dated as of July 24, 2020 only goes as far as providing an acknowledgement by the parties that, "as of the date [t]hereof, there have occurred and are continuing certain Events of Default" under the respective loan agreements. First Omnibus Constr. Loan Amend. Marks Aff. Ex. K, ¶ 19; First Omnibus Term Loan Amend. Marks Aff. Ex. L, ¶ 20. This does not have the preclusive effect asserted by SHS. Notably, those agreements do not recite or acknowledge that the Construction Note had been accelerated or that any default interest had accrued on either loan. Section 8.8 of those agreements reference a Subordination and Standstill Agreement to executed with a junior lender. That agreement is not part of the record. Commonly, such an agreement would reference the amounts outstanding with respect to the senior indebtedness as of the date of such an agreement. SHS does not contend that the Debtors acknowledged any amount of accrued default interest in that or any other document that is referenced in the Complaint. The Debtors' allegations that interest accrued with respect to each of the loans at the non-default contractual rate are supported by the December 31, 2020 account statements from HarborOne attached to the Complaint.

      The analysis of the Motion to dismiss Count I as it relates to SHS's claim to default interest on the Term Loan accruing from March 1, 2017 is largely the same as the Construction Loan. One difference is that the Term Loan appears to have matured on June 24, 2019, and the Lender gave notice to the of the failure to pay all amounts due on maturity by letter on August 2, 2019. *See* Term Loan Agreement § 1 and Term Note § 1 (both defining "Maturity Date" as "June 24, 2019, or such earlier date to which repayment of the Loan is accelerated pursuant to the terms of any of the Loan Documents"); 4/2/2019 Letter, Marks Aff. Ex. J. Subject to other

"defenses" asserted by the Debtors, this could impact calculation of default interest after maturity.

Accepting the allegations of the Complaint as true, with reasonable inferences taken, and considering the Loan documents referenced by the Complaint and provided as Exhibits to the Marks Affidavit, Count I plausibly states a claim that SHS is not contractually entitled to some or all of the default interest that it asserts it is owed. Given that ruling, it is not necessary that I reach the issues of whether the alternative theories for relief alluded to in Count I state a claim upon which I may grant relief, but the Complaint does contain sufficient allegations to state a claim with respect to the other bases for declaratory relief as well, with one exception discussed below that may be cured by amendment.

With respect to the Debtor's assertion that, even if SHS had a contractual claim for default interest accruing as of March 1, 2017, HarborOne "agreed" not to demand the payment of default interest for some or all of the claimed accrual periods prior to its assignment of the loan to SHS, the text of the initial default letters sent by HarborOne do not sufficiently controvert these allegations such that the claims should be dismissed. In the April 10, 2019 default letter relating to the Construction Loan, HarborOne agreed, "as an accommodation to Borrower, not to demand payment of additional interest at the Default Rate from such date forward but nevertheless reserve[d] its right to demand payment of the same and to pursue its remedies related thereto at a later date as it may determine to be advisable in its sole discretion." 4/10/2019 Letter 3. The Lender's reservation of "its right to demand payment of the same" is not clear as to whether the Lender was reserving its right to revoke its accommodation and demand default interest accruing at some future date or demand payment of amounts the Lender asserted

11

Case 21-01093    Doc 15    Filed 02/25/22    Entered 02/25/22 16:33:13    Desc Main
Document    Page 12 of 19

had accrued from March 1, 2017. Similarly, in the August 2, 2019 default letter relating to the Term Loan, HarborOne agreed:

> as an accommodation to Borrower and expressly subject to the provisions of this and the next paragraphs, until further notice (a) to continue to accept payments from Borrower and, in accordance with Section 17 of the Note, to apply the same to the amounts due and owing from Borrower to Lender in such manner (as between principal, interest, and other charges due on the Loan as well as timing) as Lender may determine, in its sole and absolute discretion, and (b) not to demand payment of additional interest at the Default Rate. Lender nevertheless reserves its right to revoke the aforementioned accommodation, to demand payment of [sic] in full (together with interest at the Default Rate), and to pursue its rights and remedies related thereto at a later date as it may determine to be advisable in its sole and absolute discretion.

4/2/2019 Letter 2. Again, because of the apparent omission of words following "payment of" and failure to state the date from which default interest would accrue, the language of the letter is ambiguous. Notably, in each of the letters, the paragraph following the default rate accommodation language states that the Lender was not waiving any rights or remedies. *See* 4/2/2019 Letter 2; 4/10/2019 Letter 3. It is not necessary that I rule on the proper interpretation of these letters to determine that the language of these letters alone is not sufficient to overcome the broader allegations in the Complaint in considering a motion to dismiss.

As to the Debtors' assertion that the claimed 18% default interest rate is unenforceable under applicable law as a penalty, the parties appear to agree that under Massachusetts law, a default interest clause operates as a liquidated damages provision, "enforceable . . . under the theory that they compensate the lender for damages it would incur if the borrower defaulted." *In re Charles St. African Methodist Episcopal Church of Bos.*, 481 B.R. 1, 10 (Bankr. D. Mass. 2012) ("In re Charles St."), *aff'd sub nom. OneUnited Bank v. Charles St. Afr. Methodist Episcopal Church of Bos.*, 501 B.R. 1 (D. Mass. 2013) (citing *Cummings Properties, LLC v. Nat'l Commc'ns Corp.*, 449 Mass. 490, 494, 869 N.E.2d 617 (2007)). "A liquidated damages

provision will usually be enforced provided two criteria are satisfied: first, that at the time of contracting the actual damages flowing from a breach were difficult to ascertain; and second, that the sum agreed on as liquidated damages represents a 'reasonable forecast of damages expected to occur in the event of a breach.'" *NPS, LLC v. Minihane*, 451 Mass. 417, 420, 886 N.E.2d 670, 673 (2008) (quoting *Cummings Properties, LLC*, 449 Mass. at 494); *accord Prudential Ins. Co. of Am. v. SW Bos. Hotel Venture, LLC (In re SW Bos. Hotel Venture, LLC)*, 748 F.3d 393, 414 (1st Cir. 2014) (quoting *NPS, LLC*, 451 Mass. at 420, 886 N.E.2d at 673). In argument and briefing the Debtors state that, considering that late charges are also provided under the respective promissory notes, the 18% default interest rate is grossly disproportionate to any possible estimation of actual damages arising from a default. In the Complaint, the Debtors allege that the "dramatic disparity between the rates of Default Rate (not less than 18%) and the non-default interest under the Notes (3.64% as of December 22, 2020) demonstrates that the Default Rate was not a reasonable forecast of damages, and is instead an unenforceable penalty." Compl. ¶ 63 (citing *In re Charles St.*, 481 B.R. at 12–13). SHS argues that "the Debtors fail to allege (plausibly or otherwise) that the actual damages flowing from a breach of the Loans were easily ascertained, nor do they provide any allegations articulating a reasonable estimate of damages from which this Court could conclude the damages sought were grossly disproportionate." SHS's Memo. of Law (Dkt. No. 5), 14–15. While on notice of the of the claim, SHS is correct that the Complaint does not contain sufficient specific allegations necessary to support of that claim that the default rate is unenforceable as a liquidated damages provision. This claim will be dismissed unless cured by amendment.

Turning to the allegations that the Lender's demand for the payment of default interest was made after assignment of the loans to SHS, SHS has submitted certain allonges to the

13

Construction and Term Notes that it contends demonstrate that the Loans were assigned after the demands were made. Allonge to Constr. Note, Marks Aff. Ex O; Allonge to Term Note, Marks Aff. Ex. P. While the dates may suggest that conclusion, such documents were not referenced in the Complaint and there remains a factual dispute that may not be resolved in the context of a motion to dismiss – although likely to be resolved on summary judgment or by agreement.[8]

Finally, the Debtors assert that the default interest provisions of the Construction Note and Term Note are not enforceable because they violate Mass. Gen. Laws ch. 271, § 49. The Massachusetts criminal usury statute, Mass. Gen. Laws ch. 271, § 49, "prohibits the charging of interest greater than 20% per annum unless one first informs the attorney general that one intends to charge such a rate." *In re Rolfe*, 25 B.R. 89, 94 (Bankr. Mass. 1982) (citing Mass. Gen. Laws ch. 271 § 49). The 20% allowable cap on interest includes default interest charges, even though a debtor could avoid such charges "by discharging their debts in a timely manner." *Begelfer v. Najarian*, 409 N.E.2d 167, 173 (Mass. 1980); *see also In re Loucheschi LLC*, 471 B.R. 777, 781 (Bankr. D. Mass. 2012) (concluding that "the allowable cap on interest and expenses extends beyond the contract rate of interest and includes, among other charges, sums paid or to be paid for brokerage, recording fees, and forbearance to enforce payment[s]" and recognizing that the Supreme Judicial Court of Massachusetts in *Begelfer v. Najarian*, "ruled emphatically that default charges are includable.").

Some courts have held that where interest may compound on accrued interest, "the nature of compounded interest sooner or later take the effective rate of interest above the 20% rate." *In re Rolfe*, 25 B.R. at 94. The Debtors allege "Section 5(a) in each of the Notes violates the usury statute and is unenforceable because, among other things, it provides for the accrual of interest

---

[8] *See* note 5, *supra*, regarding the consideration of the allonges in the context of the Motion.

14

on interest (i.e., compound interest)." Compl. § 75 (citing *In re Rolfe*, 25 B.R. at 94). Section 13 of each of the promissory notes is a savings clause that limits interest to be charged to the legal limit. The Debtors do not specifically allege that SHS has actually charged or claimed interest at a rate that would violate Mass. Gen. Laws ch. 271, § 49—only that, without addressing the savings clause, the promissory notes "provide for" interest that through compounding would exceed the usury rate. Compl. ¶¶ 75, 81. This claim will be dismissed unless cured by amendment.

    B.    <u>Count II (Equitable Subordination)</u>

Count II of the Complaint asserts a claim for equitable subordination under § 510(c).[9] The First Circuit Court of Appeals has adopted the following test to determine whether a claim should be equitably subordinated: "'(i) "[t]he claimant must be found to have engaged in inequitable conduct[;] (ii) "[t]he misconduct must have either resulted in injury to creditors or given the claimant an unfair advantage[;]" (iii) "[e]quitable subordination of the claim must not be in conflict with the provisions of federal bankruptcy law.'" *In re 604 Columbus Ave. Realty Tr.*, 968 F.2d 1332, 1353 (1st Cir. 1992) (quoting *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir.1977): *see also Merrimac Paper Co. v. Harrison (In re Merrimac Paper Co.)*, 420 F.3d 53, 59 (1st Cir. 2005) (noting that "[t]his court has adopted *Mobile Steel* as the gold standard for section 510(c) cases") (citations omitted). "'Misconduct is a prerequisite and determined on a case-by-case basis and conduct that shocks the conscience of the court is required.'" *Baldiga v. Moog, Inc. (In re Comprehensive Power, Inc.)*, 578 B.R. 14, 29 (Bankr. D. Mass. 2017) (quoting

---

[9] Similar to its objection to Count I, SHS asserted a procedural argument that Count II was premature because SHS had not filed a proof of claim at the time that the Debtors filed the Complaint. Subsequently, SHS filed a proof of claim.

15

*In re Wolverine, Proctor & Schwartz, LLC*, 447 B.R. 1, 44 (Bankr. D. Mass. 2011) (internal citations omitted)).

In the Complaint, the Debtors allege that SHS acquired the Loans for the purpose of obtaining the properties of the Debtors and instructed HarborOne to demand payment of default interest to which it was not entitled as a means to forward its acquisition strategy and leverage the Debtors. Compl. ¶¶ 49–50, 84–91. The Debtors allege that the result of SHS's aggressive tactics was that "[c]ustomers and vendors refused to pay deposits or extend credit to Ice. As a result, Ice lost considerable revenues." Compl. ¶ 50. The Debtors allege that the actions of SHS gave it an unfair advantage and harmed the Debtors and their creditors by forcing the Debtors into bankruptcy, resulting in significant administrative expenses that will prejudice unsecured creditors, and negatively impacting "rink operations" and possible transactions that would benefit the Debtors estate. *Id*. ¶¶ 90–91. While somewhat conclusory, these allegations have enough heft to state a claim for plausible relief.

The Debtors also allege that conduct of their former attorney should be imputed to the HarborOne (because he was also Chairman its Board) and that their former attorney engaged in misconduct when he did not take any action to stop what the Debtors characterize as acquiescence by HarborOne to the demands of SHS that HarborOne improperly demand payment of default interest or an amendment of the loan documents that would permit an assignment to SHS. Compl. ¶¶ 18–22. While certainly more attenuated than the other equitable subordination allegations, and less likely to be supported by an evidentiary record, these allegations also state a claim for plausible relief that would allow discovery on this claim.

    C.    <u>Counts III – V (Avoidance and Recovery of Fraudulent Transfers)</u>

Prior to July 24, 2020, the Debtors allege that Land East's assets were unencumbered and

that, on or about July 24, 2020, Land East executed the following agreements referenced in the Complaint: (i) the Land East Guaranty, (ii) the Land East Mortgage, (iii) the Assignment of Leases and Rents, (iv) the Environmental Indemnity Agreement, (v) the First Omnibus Construction Loan Amendment, (vi) the First Omnibus Term Loan Amendment , and (vii) a UCC-1 to HarborOne (collectively, the "Land East Agreements"). The Debtors assert that the execution of the Land East Agreements in favor of HarborOne and its successors and assigns constituted transfers that are avoidable as fraudulent transfers under Mass. Gen. Laws ch. 109A, §§ 5, 6 and § 548 of the Bankruptcy Code, and that Land East may recover the transferred property under § 550, for the benefit of its estate pursuant to § 551.[10] Compl. ¶¶ 107–148. The Debtors allege that "HarborOne advanced no funds to or for the benefit of Land East[,]" Compl. ¶ 117, "[t]he Debtors received little or no consideration in exchange for their agreements to amend Loan Agreements and provide additional collateral to HarborOne[;]" and that "[t]he First Omnibus Amendment did not include a waiver of any defaults or an agreement by HarborOne to forbear from exercising any of its rights and remedies in connection with the Loans[,]" *Id*. ¶ 34. SHS contends that the loan documents show that Land East received consideration in exchange for granting a mortgage to secure the Construction Note and Term Note because all of the Debtors, including Land East, received the benefit of additional junior financing and other concessions. The adequacy of non-monetary consideration is a question of fact that cannot be determined in the context of a motion to dismiss.

SHS also contends that § 544(b) would only permit the Debtors to avoid transfers or transactions of the debtor voidable that would be avoidable by an actual creditor under applicable

---

[10] While the allegations are made collectively by the Debtors, the prayer for relief clearly states that Land East requests that judgment enter in its favor.

law. *See generally*, 11 U.S.C. § 544; *Lassman v. Sergio (In re Sergio)*, 552 B.R. 9, 19 (Bankr. D. Mass. 2016) ("If there are no creditors against whom the transfer is voidable under applicable law, the trustee is powerless to act under section 544(b)") (quoting *Indus., Commercial Elec. Inc. v. Babineau (In re Indus., Commercial Elec., Inc.)*, Nos. 02–45451–JBR, 02–4591–JBR, 2004 WL 1354530, at *5 (Bankr. D. Mass. Apr. 7, 2004)). The same is true for the underlying state law claims pursuant to which these transfers may be avoidable through § 544—Mass. Gen. Laws ch. 109A, §§ 5 & 6, each of which requires a claim in favor of creditors which arose before or after the transfer (§ 5) or before the transfer (§ 6). The Complaint does not allege the identity of any specific creditor of Land East, but contains allegations that are sufficient and can be tested through discovery. *See* Compl. ¶ 123 ("Prior to and after such Transfers, a claim arose in favor of a creditor of Land East."); *Id*. ¶ 134 ("Prior to the Transfers, a claim had arisen in favor of a creditor of [] Land East.")

The Complaint alleges that Land East "was made insolvent" or left with unreasonably small capital as a result of the mortgage granted to the Lender. Compl. ¶¶ 125–127, 135, 143–144. The Complaint contains no allegations regarding solvency other than conclusory allegations tracking the elements of the claims. The Debtors have made no allegations regarding the value of Land East's assets, debts, or capital requirements. *See generally*, Compl.; *see also, e.g., Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 51–52 (1st Cir. 2020) (finding insolvency plausibly alleged where approximate assets before the transfer were alleged and compared to the amounts of the allegedly fraudulent transfers and debt purportedly owed to the creditor; concluding it is at least plausible that aggregate transfers consumed substantially all of transferor's assets and left him insolvent); *Butler v. Wojtkun (In re Wojtkun)*, 534 B.R. 435, 454 (Bankr. D. Mass. 2015) (finding insolvency plausibly alleged where debtor's assets and debts

were both alleged). Because of the conclusory allegations supporting the solvency element of these claims, the Court will dismiss Counts III, IV, and V unless cured by amendment.

## IV. Conclusion

For these reasons, I DENY the Motion in part and GRANT the Motion in part. The usury portion of Count I and Counts III–V are dismissed, with leave to amend. The Debtors shall file an amended complaint addressing the pleading deficiencies identified in this decision and incorporating the Claim Objection within fourteen (14) days of the date of this order.

By the Court,

Dated: February 25, 2022

_____
Christopher J. Panos
United States Bankruptcy Judge

19